PEOPLE v MILLER (AFTER REMAND)

Docket No. 136488. Submitted January 3, 1995, at Lansing. Decided May 19, 1995, at 10:00 A.M.

Michael D. Miller was convicted by a jury in the Kalamazoo Circuit Court, Philip D. Schaefer, J., of first-degree murder and possession of a firearm during the commission of a felony. The defendant appealed. The Court of Appeals, MURPHY, P.J., and SAWYER and McDONALD, JJ., entered an order on March 3, 1992, remanding the matter to the trial court to allow the defendant to file a motion for a new trial and for a hearing regarding the defendant's allegation that he was not provided before trial with a copy of an important police report regarding a witness' statement. On remand, the court conducted the hearing, determined that a new trial was not warranted and denied the defendant's motion for a new trial. The defendant appealed.

The Court of Appeals *held:*

1. The trial court did not err in admitting into evidence a videotape made by the defendant approximately ten months before the killing in which the defendant told his former girl friend that she should not see other men because "I do have the ability and the capability and the mind where I will kill somebody." The tape was relevant with regard to the defendant's intent and, because the case involved stalking, his obsession with his former girl friend. The defendant's argument that the tape is irrelevant to show intent because he did not know the specific identity of the victim when he made the tape, because the victim and the defendant's former girl friend had not yet started dating, is without merit. A defendant can intend to kill a person who occupies a specific role without knowing the victim's specific name.

2. The trial court properly allowed a witness who had been

REFERENCES

Am Jur 2d, Constitutional Law §§ 804-811; Criminal Law §§ 771, 785; Evidence § 441; Homicide §§ 10, 11, 282, 316; New Trial §§ 414, 415.

See ALR Index under Constitutional Law; Criminal Law; Homicide; New Trial; Prior Testimony or Statement.

taken by the police to view the defendant's car while it was parked in his parents' driveway to testify that the defendant's car was identical to one seen near the scene of the ·crime. Procedures akin to a corporeal lineup were not required under the Due Process Clause of the federal and state constitutions with regard to the witness' view of the vehicle. Any suggestiveness in the identification of inanimate objects is relevant to the weight, not the admissibility, of the evidence.

· 3. Any error that may have occurred with regard to the admission of certain opinion testimony by witnesses was harmless or properly cured by the trial court.

4. The trial court did not rely on outside knowledge .in admitting into evidence certain job evaluation forms' regarding the defendant's performance as a teacher in the four months before the killing.

5. The defendant's due process rights were not violated when the police did not test his hands for gunpowder residue. The police are not required to seek and find exculpatory evidence.

6. The prosecution's failure to give the defense a copy of a police report detailing a certain witness' discussions with the police in the days following the murder was not deliberate. The defendant did not request to see the report and could not have used the report in a significant manner because the evidence did not exculpate the defendant.

7. The record supports the trial court's determination that the testimony of the witness on remand was so incredible that a different result was not probable on retrial. The court did not err in denying the motion for .a new trial. Virtually every detail of the witness' story was negated by overwhelming evidence from the prosecution.

Affirmed.

1. CRIMINAL LAW — EVIDENCE — PRIOR THREATENING STATEMENTS.
   Prior threatening statements by a defendant are relevant evidence in a trial for first-degree murder where the circumstances of the threats and the murder are alike.

2. HOMICIDE — FIRST-DEGREE MURDER — INTENT.
   The intent element may be shown in a trial for first-degree murder by evidence that the defendant intended to kill a person who occupied a specific role even though the defendant did not know the specific identity or name of the victim.

3. CRIMINAL LAW — DUE PROCESS — WITNESSES — INANIMATE OBJECTS.
   Procedures akin to a corporeal lineup are not required under the

Due Process Clauses of the federal and state constitutions when inanimate objects are viewed by witnesses; any suggestiveness in the identification of inanimate objects is relevent to the weight, not the admissibility, of the evidence (US Const, Am V; Const 1963, art 1, § 17).

4. CRIMINAL LAW — EVIDENCE.

The police are not required to seek and find evidence that will exculpate a defendant.

5. CRIMINAL LAW — EVIDENCE.

Where it is claimed that the prosecution has withheld evidence, a court must consider whether the suppression was deliberate, whether the evidence was requested, and whether the defendant could have put the evidence to significant use.

6. CRIMINAL LAW — NEW TRIAL — NEWLY DISCOVERED EVIDENCE.

A defendant seeking a new trial on the basis of newly discovered evidence must demonstrate that the evidence is newly discovered, is not merely cumulative, probably would have caused a different result, and was not discoverable and producible at trial with reasonable diligence.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *James J. Gregart,* Prosecuting Attorney, and *Michael H. Dzialowski,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *F. Martin Tieber*), for the defendant on appeal.

AFTER REMAND

Before: FITZGERALD, P.J., and MARILYN KELLY and G. N. BASHARA, JR.,* JJ.

PER CURIAM. Defendant was convicted of first-degree murder, MCL 750.316; MSA 28.548, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), and was sentenced to life imprisonment and two years'

_____

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

imprisonment for the respective convictions. He appeals as of right. We affirm.

## FACTUAL BACKGROUND

Defendant was convicted of shooting and killing Kevin AcMoody, who had been dating the defendant's former girl friend.

### DEFENDANT'S RELATIONSHIP WITH THE VICTIM'S GIRL FRIEND

Gracia Davis testified that she met the defendant in 1984, when she enrolled in a photography class that utilized a laboratory in which the defendant was working. Davis was seventeen years old; defendant was thirty-one. Davis testified that she began dating defendant in April 1984, and broke off the relationship approximately a year later. Davis indicated that she lived with defendant off and on between 1984 and 1986 or 1987 when she met a man she later married, Mohammad Hamouda.

Davis testified that before her marriage, defendant became obsessive if she dated other men. Davis testified that while she was dating her future husband, defendant would harass them by calling and following them. She described an altercation that occurred before her marriage in which the defendant approached her and Hamouda and began attacking, choking, and kicking Hamouda, prompting Hamouda to stab defendant with a kitchen knife. Davis testified that defendant said that he would not prosecute Hamouda if the couple would separate.[1]

In February 1988, defendant moved to Taiwan to

---

[1] Davis and Hamouda later divorced. Hamouda testified that he was in Qatar when the murder occurred.

"get away from" Davis. While defendant was in Taiwan, he sent her six or seven videotapes of himself talking to her on camera. Davis testified that she went to Taiwan to visit defendant. At that time, defendant told Davis that he had let himself into the apartment she shared with Hamouda while they were out and would try to think of ways to hurt Davis, such as harming her cat. Davis concluded that defendant was obsessed with her rather than in love with her. Nonetheless, when defendant returned from Taiwan, he lived with her for about one month.

Davis began dating Kevin AcMoody in December 1989. Even before she began dating AcMoody, she saw defendant standing in the parking lot of her apartment complex five or six times, staring at her window. Davis testified that defendant became upset when he learned that AcMoody was spending nights at her apartment; in February 1990, in Davis' presence, defendant pulled out some of his own hair, hit himself in the face, and cried as he questioned why Davis had chosen AcMoody over him.

Defendant called Davis numerous times between January and March 1990, leaving messages asking her to come back to him. Davis testified that on one occasion defendant knew that she was going skiing up north with the victim, and defendant knew exactly where she went and what time she arrived back in town.

Davis testified that AcMoody had spent the night at her apartment the night before he was shot and that he had left to return to his apartment at approximately 6:00 A.M. As soon as Davis heard about a shooting on the street where the victim lived, she immediately thought of defendant and AcMoody. Davis testified that she believed defendant was capable of killing and that he killed

the victim because defendant knew the relation-
ship with AcMoody had become serious.

A detective testified that his postarrest search of
defendant's dresser turned up an envelope with
two license plate numbers—one belonging to the
victim and one belonging to a resident of Davis'
apartment complex who owned a vehicle similar to
the victim's.

### THREATENING VIDEO TAPE

A letter sent to defendant by Davis was read
into evidence, and the defendant's videotaped re-
sponse was shown. In that tape, recorded about
ten months before the murder, the defendant told
Davis that she should not see other men "because
I do have the ability and the capability and the
mind where I will kill somebody." Defendant's
objections to the admission of the tape will be
addressed in Issue I, *infra.*

### DEFENDANT'S STATEMENTS TO OTHERS BEFORE THE CRIME

A man testified that he saw defendant at a gym
where they both worked out. Approximately one
week before the murder, defendant asked him if
he knew where he could get a gun that could not
be traced and that would have to be thrown away.

A male employee at the gym testified that about
a week before the killing defendant came to the
gym and asked a female employee if she knew a
good criminal attorney because he was "going to
go all the way on the girlfriend thing." The female
employee denied the conversation took place.

Defendant had told one woman that he wished
AcMoody were dead so that Davis would come
back to him and he would not feel bad if some-

thing bad happened to AcMoody. She testified that defendant had told her approximately two weeks before the murder, which happened on a Wednesday, that something bad was going to happen by Wednesday. She also testified that defendant offered to beat up her ex-boyfriend for her because he did not like foreigners.

### DEFENDANT'S ACTIONS ON THE MORNING OF THE MURDER

Defendant's neighbor testified that on the day of the murder, she heard a car leave defendant's driveway at 5:25 A.M. (the murder occurred at about 6:10 A.M.). She testified that when she later heard defendant drive his car around the block, it sounded the same as the car she heard the morning of the murder. Her identification of the sound of the car is addressed in Issue III, *infra.*

### IDENTIFICATION OF DEFENDANT'S CAR

A woman who lived near the victim's apartment testified that on the morning of the murder she heard what sounded like a car backfiring at 6:05 or 6:10 A.M. Three to five minutes later, she saw a car with what looked like a male driver run a stop sign at a high rate of speed. When she returned home that day, she recognized a car pictured on a police flyer as being the one she saw run the stop sign. She notified the police, but indicated that the car she had seen had a rack on the back. The police took her to look at defendant's car several days later (it was parked in defendant's parents' driveway); she indicated that it appeared to be identical to the car she had seen. That identification is addressed in Issue II, *infra.*

ACCUSATORY STATEMENTS OF DEFENDANT'S FRIENDS
AND NEIGHBORS

Defendant's neighbor testified that on the day of
the murder he asked one of the police officers
involved in the investigation if the victim had
been killed with a .22 caliber pistol because he
knew that defendant had such a gun. Defendant
had told the neighbor that he wanted it for protec-
tion and also that he would not feel bad if he had
to get rid of it after using it.

Cynthia McKnight, defendant's roommate for
approximately six months and a lifelong friend,
testified that defendant was not at home when she
got up at 8:30 A.M. on the day of the murder. A
detective testified that McKnight seemed nervous
when interviewed the morning of the murder in
her apartment. Defendant's objection to this opin-
ion evidence is addressed in Issue IV, *infra.*

A detective testified that he spoke with Gracia
Davis on the morning of the murder and she told
him of her concerns that the defendant was in-
volved. This evidence is also addressed in Issue IV,
*infra.*

A secretary at a school where defendant served
as a substitute teacher testified that the defendant
arrived at work in a quiet and unhappy mood,
contrary to his normal talkative, "happy and bub-
bly" personality.

The court admitted into evidence six teacher
evaluations regarding defendant that were pre-
pared between December 1989 and March 1990.
The prosecutor offered them to show a rapid dete-
rioration in defendant's personal life in the four
months before the crime. The trial judge stated
that he knew some of the teachers who prepared
the evaluations; defendant's objection regarding

that personal knowledge is addressed in Issue v, *infra.*

The officer in charge of the investigation testified that the defendant admitted that he was obsessed with Davis and that she was his reason for living, but defendant denied the killing and denied knowing where AcMoody lived. Defendant further told the officer that he had put Davis behind him and had met a woman at a dance club whom he described as thirty-two years old, blonde, and blue-eyed. When contacted by the police, the woman was actually a twenty-year-old African American with black hair and brown eyes.

Other isolated facts specific to the issues will be raised hereafter.

I

Defendant first argues that the court erred in admitting into evidence the videotape made by the defendant about ten months before the killing. In that tape, the defendant told Davis that she should not see other men "because I do have the ability and the capability and the mind where I will kill somebody." Defendant argued that his statements were only boasts and an accession to Davis' request that he talk rough to her. The prosecutor offered the tape to show defendant's intent and that he acted in conformity with the threats made on tape. The defendant argued that the tape was too remote in time to show his intent on the day the victim was shot and that the victim was unknown to the defendant when the tape was made (the victim was not yet dating Davis at that time), so there was no connection between generalized threats and the specific intent to kill AcMoody. The court found the tape relevant to a "continuing pattern."

The tape was relevant with regard to defendant's intent and, because this case involved stalking, his obsession with Davis. See *People v Melvin,* 70 Mich App 138, 144-146; 245 NW2d 178 (1976); *People v DeRushia,* 109 Mich App 419, 426; 311 NW2d 374 (1981) (prior statements are relevant where the circumstances of the threat and the murder are alike). Although the tape was made about ten months before the killing (and it is therefore arguable whether the defendant's intent remained the same), this does not affect the admissibility of the evidence. See *Melvin, supra* (threatening letter written as long as 2½ years before murder held admissible).

*People v Goddard,* 429 Mich 505; 418 NW2d 881 (1988), is distinguishable on the same grounds as *DeRushia.* In *DeRushia,* the circumstances of the killing during a drawn-out fight were "very different" (in the Court's words) from a statement the defendant had made nine months earlier that she had pointed a gun at the eventual victim while he slept and "would have killed him." In *Goddard,* an accidental discharge of a gun during a breaking and entering was different from what the Court characterized as the "completely hypothetical" statement six months before that the defendant would give a warning shot and then start shooting people if he were caught committing a breaking and entering—a situation the Court stated "never occurred." In our case, however, the defendant stated earlier that he would kill if Gracia Davis dated other men, and that statement fit squarely within the stalker/obsessive theory urged by the prosecution and supported by overwhelming testimony.

Defendant's argument that the tape is irrelevant to show intent because he did not know the specific identity of the victim when he made the tape

(because the victim and Davis had not yet started dating) is without merit. A defendant can intend to kill a person who occupies a specific role without knowing the victim's specific name. Cf. *People v Graves,* 52 Mich App 326; 217 NW2d 78 (1974) (conviction of felony murder for killing of by-stander after completion of robbery).

II

Defendant next argues that the court erred in allowing testimony that his car was identical to one seen near the scene of the crime. Defendant argues that the testimony was tainted because the police took the witness to view the defendant's car while it was parked at defendant's parents' home. He asserts that the viewing was unduly suggestive and that procedures akin to a corporeal lineup were required under the Due Process Clauses of the state and federal constitutions (Const 1963, art 1, § 17; US Const, Am V). We disagree.

The police had issued a flyer depicting a vehicle suspected of being involved in the crime. The witness in question contacted the police and informed them that she had seen a similar car drive past her at a high rate of speed on the morning of the murder. She told the police, though, that the car she saw had a luggage rack or other metal rack on the back of the car, which was not depicted in the flyer. Several days later (and after defendant's arrest), a police officer took the witness to defendant's parents' house to view defendant's car; the witness stated that that car was identical to the one she had seen on the morning of the murder. The trial court admitted the evidence, determining that the identification procedure was not tainted because the witness had approached the police with her information.

We have found no Michigan cases addressing whether lineup procedures applicable to human suspects must also be employed when inanimate objects are viewed by witnesses. After reviewing the cases of other jurisdictions, we hold that such procedures are not mandated by either the state constitution or the federal constitution. The risks inherent in a misidentification of inanimate objects produced in the thousands are not the same as the risks of misidentification of unique human beings. We add Michigan to the growing list of states that hold that any suggestiveness in the identification of inanimate objects is relevant to the weight, not the admissibility, of the evidence. See *Buchanan v State,* 561 P2d 1197 (Alas, 1977); *State v Roscoe,* 145 Ariz 212; 700 P2d 1312 (1984); *People v Coston,* 40 Colo App 205; 576 P2d 182 (1977), aff'd 633 P2d 470 (1981); *Klase v State,* 346 A2d 160 (Del, 1975); *State v Bruns,* 304 NW2d 217 (Iowa, 1981); *Rackley v Commonwealth,* 674 SW2d 512 (Ky, 1984); *Brooks v State,* 560 NE2d 49, 57 (Ind, 1990); *Commonwealth v Carter,* 271 Pa Super 508; 414 A2d 369 (1979); *State v Cyr,* 122 NH 1155; 453 A2d 1315 (1982); *Inge v Commonwealth,* 217 Va 360; 228 SE2d 563 (1976); *State v King,* 31 Wash App 56; 639 P2d 809 (1982). Although one court has opined that a suggestive lineup of inanimate objects might violate the Due Process Clause under unspecified circumstances, see *Commonwealth v Jones,* 25 Mass App 55; 514 NE2d 1337 (1987), that court had no difficulty upholding the identification when confronted with facts remarkably similar to the procedures followed in our case.

III

Defendant next argues that a witness was not qualified to render an opinion about the sound of

the defendant's car leaving home early the morning of the murder and that suggestive procedures were employed that resulted in the witness' adverse comparison. Defendant's argument overlaps his presentation of Issue II, *supra.*

We note that the defendant did not object to the testimony at trial, and therefore the issue was not preserved for review. MRE 103(a)(1). We may review constitutional claims without adherence to strict rules of issue preservation if an outcome-determinative issue is involved. *People v Grant,* 445 Mich 535, 547; 520 NW2d 123 (1994). Nonetheless, we have already rejected defendant's argument that lineup procedures were constitutionally mandated.

IV

Defendant argues that the trial court abused its discretion in allowing three aspects of "opinion" testimony. First, Gracia Davis testified that she immediately thought of the defendant when she learned AcMoody had been killed. In light of the overwhelming evidence of defendant's obsession, any error is harmless beyond a reasonable doubt.

Second, an inmate housed with the defendant testified that it was his "gut feeling" that the defendant had committed the crime. This testimony was not taken in the jury's presence and was not admitted into evidence. Therefore, it could not have affected the verdict and cannot require reversal.

Third, a detective testified that defendant's female roommate, Cynthia McKnight, seemed nervous when interviewed about the crime. Defendant argues that it is improper for a witness to comment regarding the credibility of other witnesses. The defendant objected below, and the court

struck the testimony. Defendant has already received his relief.

## V

Defendant had worked as a teacher. Several job evaluation forms were admitted into evidence under the public records exception; those forms indicated that defendant's performance declined in the four months before the killing. On appeal, defendant argues that the forms should not have been admitted because the judge stated outside the jury's presence that he knew some of the declarants and specifically stated that he valued the judgment of one teacher.

We reject the defendant's argument that the court improperly relied on "outside knowledge," particularly because the court did not sit as trier of fact. *People v Ramsey,* 385 Mich 221; 187 NW2d 887 (1971); *People v Simon,* 189 Mich App 565; 473 NW2d 785 (1991).[2]

## VI

Defendant next argues that his right to due process of law was violated when the police failed to test his hands for gunpowder residue so that he could be exculpated. We disagree. The police are not required to seek and find exculpatory evidence. *People v Stephens,* 58 Mich App 701; 228 NW2d 527 (1975); *People v Merriweather,* 50 Mich App 751; 213 NW2d 756 (1973).

## VII

Defendant argues that the cumulative effect of

---

[2] We offer no opinion regarding whether evidence of this nature was admissible because the issue has not been raised on appeal.

the errors discussed above denied him a fair trial. While we agree that the cumulative effect of several minor errors may warrant reversal when one error standing alone might not, *People v Smith,* 158 Mich App 220, 232; 405 NW2d 156 (1987), in this case we find no such cumulative effect.

## VIII AND IX

Defendant argues that the trial court erred in denying his motion for a new trial based on newly discovered evidence. Defendant claims that he is entitled to a new trial because of his recent discovery of Carl Popkey and Popkey's alleged observations on the morning of the murder.

This Court, MURPHY, P.J., and SAWYER and Mc-DONALD, JJ., remanded the case for a hearing to determine whether the police department or prosecutor's office had denied defendant access to evidence regarding Popkey's story. Unpublished order of the Court of Appeals, dated March 3, 1992 (Docket No. 136488). A five-day hearing was held at which various witnesses testified regarding whether Popkey's identity was known to the defense before trial and whether the prosecution had deliberately tried to hide this witness from the defense by virtue of missing police reports. An offer of proof was made with regard to Popkey's testimony, and rebuttal testimony was offered by the prosecution.

### A. SUPPRESSION OF EVIDENCE

Defendant argues that the trial court should have granted a new trial because the prosecutor and police suppressed witness Popkey's identity and statements. Where evidence is suppressed, proper considerations for the reviewing court are

whether (1) suppression was deliberate, (2) the evidence was requested, and (3) the defense could have significantly used the evidence. *People v Davis,* 199 Mich App 502; 503 NW2d 457 (1993).

There were two sets of police reports involved in this case. One set, contained in the prosecutor's file and copied by the defense, indicated that Carl Popkey had seen or heard nothing the morning of the murder. Those records were prepared on the day of the murder and reflect one officer's discussions with Popkey. The second set contained additional reports, including more details about Carl Popkey's discussions with other officers in the days after the murder. In those reports, Popkey told investigators that he had seen events leading up to the murder and heard an altercation before a gunshot. The defense denied receiving these more detailed reports.

Although the prosecution had copies of these reports in its trial notebook, no one could testify that the defense had actually received this second set of reports. At the hearing on remand, the trial prosecutor testified that she received the second set of reports approximately one week after the initial warrant authorization. She further testified that she believed she gave the reports to a support staff member to be placed in the main file. The prosecutor testified that she photocopied all the reports from the main file about half a year later (as trial approached), and believed that is how she obtained copies for her trial notebook. The defense had come to the prosecutor's office before that time and had copied what they believed to be the entire file, yet the second set of reports was not among the copies. The prosecutor testified that she reviewed the file during the proceedings on remand, and the second set of reports was missing. She further testified that after defendant was

convicted, the probation department and numerous other people had access to the file, but she had no explanation regarding how the reports had disappeared.

The prosecutor also testified that she had spoken with one of defendant's trial attorneys the day before trial and asked him if he was going to call Popkey or "the guy upstairs," to which defense counsel indicated that the guy was just a "kook." Both defense attorneys denied saying this and denied knowing any more than was stated in the first set of police reports: that Popkey had denied seeing or hearing anything.

No one could testify that the reports ended up in the defense's possession. In light of the defense offered at trial, it is likely Popkey would have been called as a defense witness had the defense known of the contents of the second set of police reports. We agree with the trial court's conclusion that the defense never knew of Popkey's story before trial.

In the instant case, there was no evidence presented that the suppression was deliberate—a point conceded by defense appellate counsel at the hearings. The evidence apparently was not requested, although the lower court found that liberal discovery practices in Kalamazoo County made formal requests unnecessary. Whether the defense significantly could have used the evidence is answered in the negative by the discussion *infra* because the evidence did not exculpate the defendant.

### B. PROBABILITY OF DIFFERENT RESULT

Before a new trial is warranted, a defendant must demonstrate that the evidence (1) is newly discovered, (2) is not merely cumulative, (3) proba-

bly·would have caused a different result, and (4) was not discoverable and producible at trial with reasonable diligence. *People v Mechura,* 205 Mich App 481, 483; 517 NW2d 797 (1994). A trial court's decision regarding a motion for a new trial based on newly discovered evidence will not be reversed absent an abuse of discretion. *Davis, supra* at 515.

In the instant case, the trial court determined that defendant had met the first, second, and fourth conditions, but did not meet the third. Carl Popkey's name was disclosed as a potential witness on one of the prosecution's witness lists three months before trial, but police reports in defense counsel's possession indicated that Popkey had told the officer who first canvassed the building that he had not seen anything. Thus, while it is arguable whether Popkey was a newly *discovered* witness, *Kroll v Crest Plastics, Inc,* 142 Mich App 284, 291-292; 369 NW2d 487 (1985), his more-detailed story as revealed in later police reports and at the hearing on remand was certainly newly discovered.

The trial court found that Popkey was so incredible that a different result was not probable on retrial. The record adequately supports this conclusion.

We have reviewed the extensive record made on remand, including videotaped testimony of Mr. Popkey. By all outward appearances, Mr. Popkey seemed credible—he was articulate, intelligent, well-mannered, and seemed to have no apparent trouble recalling details. He also explained inconsistencies in earlier statements with varying degrees of plausibility. As the defendant pointed out, the prosecution had presented Mr. Popkey as a prosecution witness in another case about a year earlier.

It is difficult to say with precision what makes a

witness inherently incredible; attorneys and judges often picture in their minds a shifty person who is easily caught in contradictions and outright lies and gives an erratic appearance. Mr. Popkey's testimony as viewed on the videotape clearly does not fit within that extreme description. As we stated earlier, by all outward appearances he was credible, and the alleged comment that defense counsel did not pursue his testimony because he considered him to be "just a kook" (which defense counsel denied) does not do the witness justice.

But credibility means much more than outward appearances—especially where, as here, defendant's burden is to show that a different result would have been *probable* had the witness testified at trial. *Davis, supra.* Our analysis must necessarily include the plausibility of the proposed testimony and its comparison to the known body of evidence presented at trial and the additional prosecution evidence that was produced at the hearing on remand. When that evidence is viewed, Mr. Popkey's story falls apart and ample support is found for the trial court's conclusion that a different result was not probable had Popkey testified at trial.

For perspective, Mr. Popkey's story was essentially as follows (a more detailed analysis will appear later in this opinion). It was undisputed that Mr. Popkey lived in the same apartment building as Mr. AcMoody and Mr. AcMoody was killed just outside that building. Virtually every fact after that is disputed. Mr. Popkey testified that he had been awakened shortly before the murder by the lights and sounds of three vehicles pulling into the parking lot of the apartment building. The first vehicle was Mr. AcMoody's pickup truck. It was followed by a dark pickup truck and a blue car. Mr. Popkey dozed back to a

light sleep but was awakened by several voices and sounds indicative of an altercation. A shot was fired, and Mr. Popkey looked out his window to see the blue car driving away. Later that day, Mr. Popkey said, the dark pickup truck and the blue car returned to the apartment building. The occupants of those vehicles were drinking beer and making noise, and entered the building. They emerged a few minutes later with a steel lockbox presumably taken from Mr. AcMoody's apartment. The occupants of those vehicles were led by Mr. AcMoody's girl friend.

The defense at trial was that the murder was committed by someone other than the defendant. Although defendant attempted to implicate Davis' ex-husband in the killing, the prosecution produced the ex-husband in rebuttal, and his passport demonstrated that he was out of the country when the killing occurred. The implication of Mr. Popkey's testimony was that the girl friend was involved in the killing, which could have aided the defense. Mr. Popkey had also speculated (either seriously or jokingly) about possible "Mafia" or drug killings, and the retrieval of the lockbox could fit within such a theory. At the hearing on remand, defense counsel also suggested that the story of an altercation could have supported a conviction on a lesser charge such as manslaughter. Although these various defenses were plausible, we agree with the trial court that success on any or all of these theories was not probable.

Virtually every detail of Mr. Popkey's story was negated effectively by overwhelming evidence from the prosecution. As we stated earlier, it is here that the story falls apart and Mr. Popkey's credibility was decisively undermined. See *Mechura, supra* at 484.

Crucial to our analysis are the following incon-

sistencies revealed in the testimony at the hearing on remand.

(1) Mr. Popkey said he was awakened by vehicle lights "dancing" off his apartment walls. Yet the proofs showed that Mr. Popkey's apartment was on the second floor, so the lights would not have shined in. In addition, Mr. Popkey's supervisor testified that Popkey said on the morning of the murder that he was awakened by the police car flashers, not the headlights of vehicles entering the parking lot. A neighbor testified that Popkey told her that he did not know anything had happened until the police arrived.

(2) Mr. Popkey also said he was awakened by loud music coming from one of the cars. Again, he never mentioned that to his supervisor on the day of the murder. A neighbor said Popkey did not reveal this information until a few days after the incident.

(3) Mr. Popkey said he was awakened the second time by an altercation involving "four or five" male voices. This was never mentioned to his supervisor when the police car lights were discussed. Popkey's former girl friend testified that Popkey had told her on the day of the murder that he had heard *two* men arguing.

(4) When the police arrived and began canvassing the neighbors, Mr. Popkey told the officer that he only had heard knocking on a door. He did not tell the officer that he had heard the altercation or had seen the vehicles. At the hearing on remand, Mr. Popkey explained that he thought the officer was only looking to see whether the killer was in the apartment building and that explains why Popkey did not offer any details about the circumstances of the killing. This explanation, although somewhat plausible, becomes less credible when the surrounding facts are examined. While the

police officer apparently did not know how many people were involved, Mr. Popkey later said that four or five voices were heard arguing. In addition, the officer was looking for a suspect in the apartment building, yet Mr. Popkey later said that a suspect's car departed shortly after the killing. It is hard to believe that a person with as much knowledge as Mr. Popkey later claimed to have would dismiss the officer's investigation so quickly, especially given his persistent attempts later to inject himself into the case.

(5) Mr. Popkey testified that what he believed to be the same vehicles returned later in the day. The victim's family and girl friend testified that they indeed went to the apartment to retrieve clothes for burial and also removed a lockbox for safekeeping reasons. They denied that they had been to the apartment that morning.

(6) Mr. Popkey testified that the girl friend and her companions were drinking beer and were in a jovial mood. Each of those people testified that they were not drinking and were somber.

(7) Mr. Popkey testified that he saw the victim's vehicle followed by two other vehicles in the morning. Popkey's supervisor said Popkey told him about the cars, but only mentioned that they had been seen in the evening—not the morning of the murder.

(8) Mr. Popkey testified that he remembered additional details as time went on. Mr. Popkey's former girl friend testified that Popkey had a tendency to embellish stories and that, although they had discussed the case in detail near the date of the murder, the details that were emerging during the hearing on remand were "new" to her. She also said that Popkey got angry with her when she told him that there were too many inconsistencies in his changing stories. Popkey's

neighbor also testified that "every time I would talk to Carl he would remember something else" and "his story had completely changed."

Less critical to our analysis, yet important to the credibility of the witness, were the following inconsistencies.

(1) Mr. Popkey said in some versions that his daughter had been awakened by the commotion and in other versions stated that she slept through the incident.

(2) A detective testified that Mr. Popkey said that he thought at the time that the gunshot was the sound of his child falling out of bed, but Popkey denied this on the stand. Such a version was inconsistent with his statement that the child slept through the incident.

(3) A detective and a neighbor testified that Mr. Popkey was on the neighbor's balcony on the day of the incident. Popkey denied this, saying he was at work. Popkey testified, though, that he was on the balcony a day later, but the detective said that was inconsistent with the date he was on the scene investigating.

(4) Mr. Popkey said the detective did not take notes during his questioning of Popkey, but the detective testified he did.

(5) Mr. Popkey said he viewed a photograph or photocopy of a Honda Accord similar to the defendant's vehicle when he met with the detective, and said he was adamant that an Accord was not at the murder scene. The detective testified that the photo was prepared for general distribution a day *after* the interview and was not shown to Popkey during the interview.

(6) Popkey denied attending the preliminary examination. The detective said that he saw Popkey at the exam and that Popkey had specifically

asked why he had not been subpoenaed to testify. Popkey's personnel records were inconclusive, but his supervisor said Popkey seemed to know more details of the proceeding than had appeared in the press.

(7) Popkey said he removed police tape from the victim's apartment door a few days later. The victim's girl friend and family members testified that the tape already was gone the afternoon of the murder when they went to the apartment to get the victim's burial clothes and lockbox. Mr. Popkey's story would be inconsistent with his theory that the killers returned that afternoon and removed articles from the apartment (assuming, of course, they entered through the door).

(8) Mr. Popkey also admitted that a version he earlier had told a defense attorney was "probably" untrue.

Moreover, many key aspects of Mr. Popkey's story were consistent with the prosecution's theory and the evidence produced to prove the theory. Popkey believed that the blue car he saw leaving the scene after the murder was the same blue car he saw later that afternoon, although he admitted it could have been a different car. Defendant's car was blue. Popkey said he heard an altercation shortly before the murder. It would be reasonable to expect that a verbal altercation might have taken place as the killer confronted the victim. The implication of Mr. Popkey's testimony was that the girl friend was involved in the murder, but Mr. Popkey did not see the killing and did not see the people involved. Nothing in Popkey's testimony exculpates the defendant, even if it broadens the range of what the defense may suggest or imply was a possible conspiracy. And a conspiracy would be more consistent with first-degree premed-

itated murder than a lesser charge such as manslaughter.

The court did not abuse its discretion in denying a new trial on the basis of the conclusion that a different result was not probable. The inconsistent testimony given by Popkey and the incredulous manner in which his observations evolved support that determination. *People v Paugh,* 324 Mich 108, 114; 36 NW2d 230 (1949) (court did not err in denying a motion for a new trial where newly discovered witnesses were of questionable character and their testimony was inconsistent).

Affirmed.