*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LAKE SERVICE SHIPPING COMPANY,

Plaintiff-Appellee,

UNPUBLISHED
November 17, 2022

v

No. 356073
Muskegon Circuit Court
LC No. 18-005250-CK

GRAND RIVER NAVIGATION COMPANY, INC.,

Defendant-Appellant.

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

This contract dispute involves a barge—the McKee Sons—owned by plaintiff Lake Service Shipping Company (LSSC) that was chartered by defendant Grand River Navigation Company (GRNC). The charter party agreement required GRNC to "maintain and repair the Vessel, together with her machinery, appurtenances and spare parts, in a good state of repair and in seaworthy, good and efficient operating condition[.]" LSSC brought this lawsuit, alleging that GRNC breached the agreement by prematurely returning the vessel in a deplorable, non-seaworthy condition. After a four-day trial, the jury agreed and awarded LSSC over $11 million in damages.

Among other smaller challenges, GRNC complains that the trial court improperly deemed the phrase "then value" in the escape clause of the agreement ambiguous and allowed the jury to determine its meaning. We discern no error and affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

LSSC is the subsidiary of a mining company headquartered in Muskegon. It owns the McKee Sons, a "self-unloading barge" that requires a tugboat for movement. However, LSSC does not have the means to operate its own shipping services. Accordingly, in 2000, LSSC entered a charter party agreement with GRNC, a large shipping company, to maintain and operate the vessel. Under the agreement, GRNC was required to make charter (lease) payments to LSSC. It was also fully responsible for the maintenance, repair, and operation of the vessel. The parties renewed the agreement several times, with its final term set to expire in 2018.

As required by ¶¶ 1 and 4 of the 2000 agreement, LSSC delivered the McKee Sons to GRNC "in class and in suitable condition to obtain its U.S. Coast Guard inspection certificate" and "in good operating and seaworthy condition." GRNC sailed the McKee Sons on the Great Lakes for 12 years, until December 2012. By that time, the McKee Sons needed structural steel repairs to remain in a seaworthy and good operating condition. GRNC placed the McKee Sons in "laid up" status and did not perform any necessary repairs, either structural or more run-of-the-mill. GRNC claimed that it intended to eventually put the McKee Sons back in service and continued to make its charter payments throughout 2013 and 2014. However, in December 2014, GRNC returned the McKee Sons to LSSC's dock in Muskegon. When GRNC returned the barge, rotting perishable goods remained unremoved. Barrels and cans of paint, gasoline, and other hazardous waste had to be hauled away by specialists. Pipes had burst and electrical systems had rotted. Below deck was a toxic wasteland. Even worse, it appears that GRNC may have looted the ship for parts. The exhaust system was missing as were several critical machinery parts. After it returned the vessel, GRNC notified LSSC that it was terminating the charter agreement under ¶ 15(a) because it opined that the cost of necessary repairs exceeded the then value of the vessel.

LSSC filed suit, alleging that GRNC breached the charter agreement. Relevant to this appeal, ¶ 3(a) of the 2006 charter agreement provided:

> [GRNC] agrees that at all times during the Term of this Agreement [GRNC] shall maintain and repair the Vessel, together with her machinery, appurtenances and spare parts, in a good state of repair and in a seaworthy, good and efficient operating condition, always in accordance with the standards of the American Bureau of Shipping [ABS], the United States Coast Guard and good commercial maintenance practices. Repairs and maintenance include the costs of special surveys due in 2003, 2008, 2013, and 2018, should [GRNC] elect to exercise its option to extend this Agreement beyond 2018.

Paragraph 3(c) further provided that the parties "shall endeavor to mutually agree on repairs or maintenance to be performed" and if they cannot, then qualified experts would evaluate the vessel and deem what repairs and maintenance are necessary. Paragraph 6 also governed GRNC's duty to maintain the vessel, providing, "From the time of delivery to the expiration of the Agreement, [GRNC] shall, at its own expense or by its own procurement, . . . repair and maintain the Vessel" and requiring GRNC to bear the cost of "repairs and maintenance."

Paragraph 11 governed the return of the vessel at the end of the contract:

> [GRNC] agrees . . . that upon termination of this Charter, whether by limitation or otherwise, to return said Vessel to [LSSC] at Muskegon, Michigan, or other agreed Great Lakes location, in like good condition, ordinary wear and tear excepted. . . .

LSSC alleged that GRNC breached these provisions.

GRNC invoked ¶ 15(a) of the charter agreement in support of its early termination of the agreement:

> The parties hereto further mutually agree that in the event of a total loss and/or constructive total loss of said Vessel, or if it has been irreparably damaged,

Charter hire payment shall terminate upon the date of said loss, and any prepaid Charter hire shall be returned by [LSSC] to [GRNC]. In the event, however, of a loss other than total loss or constructive total loss, irrespective of the cause of the same, force majeure always excepted, or the duration of the delay occasioned thereby, the Charter hire payment shall be paid in full as hereinbefore specified.

If at any time during the Term of the Charter under the Agreement the cost of all required structural repairs necessary for [GRNC] to remain in compliance under this Agreement at the time of each five year classification society inspection due to normal wear and tear exceeds the *then value* of the Vessel, the Charter under this Agreement may be terminated by [GRNC] upon 20 days' written notice to [LSSC]. In that event, the hire is to be prorated from the last yearly term payment. [Emphasis added.][1]

The first paragraph of this provision relieves GRNC of its duty to maintain or repair the barge if an event occurs resulting in a total or constructive loss of the vessel. The second paragraph addresses "required structural repairs" "due to normal wear and tear." If the cost of making the structural repairs "exceeds the *then value* of the vessel," GRNC did not have to undertake the cost.

GRNC sought summary disposition of LSSC's suit based on ¶ 15(a) before trial, but the trial court denied that motion. During the ensuing four-day jury trial, the parties presented significant evidence related to their business dealings and contract negotiations, their interpretations of the agreement language, the condition of the McKee Sons upon its return in December 2014, the repairs needed and their costs, and GRNC's lack of maintenance of the McKee Sons between December 2012 and December 2014.

The parties also presented evidence regarding the ABS surveys conducted on the vessel. The parties agreed that in order to maintain ABS class certification, vessels are subject to various surveys. During a five-year survey, a vessel is taken out of the water and put on blocks for a thorough inspection (also known as being "dry-docked"), including evaluation of the thickness of the vessel's steel hull using steel gauging. At a certain level of deterioration, steel must be replaced. The McKee Sons was scheduled for a special survey in 2012. However, unlike saltwater vessels, vessels in the Great Lakes can obtain a one-year extension of this survey by undergoing a "year-of-grace survey." During this year-of-grace survey, problems will still be identified and the vessel will have to undergo necessary repairs to address any readily apparent issues.

---

[1] The second paragraph of ¶ 15(a) was changed from the original 2000 agreement. In the original agreement, the second paragraph of ¶ 15(a) provided:

If at any time during the Term of this Charter the cost of any required operational repairs to equipment and machinery exceeds the then value of the Vessel, this Charter may be terminated by [GRNC] upon 20 days' written notice to [LSSC]. In that event, the hire to be prorated from the last yearly term payment.

The McKee Sons underwent a year-of-grace survey in 2012, effectively postponing the special survey until 2013. In anticipation of the 2013 special survey, GRNC evaluated the McKee Sons for needed repairs, including undertaking visual inspections and ultrasonic readings related to steel thickness. GRNC determined what repairs would likely be required, including structural steel work, and secured quotes for the work. It then created a 10-year plan for completing that work. GRNC never followed through with the 2013 special survey and the ABS neither confirmed what work was required nor approved the repair plan.

At trial, the parties presented highly varying testimony regarding the costs of necessary repairs to the McKee Sons, from a low of approximately $3.2 million to a high of $9 million. They also presented evidence regarding the value of the McKee Sons. An expert appraiser hired by GRNC opined that in its present condition, the McKee Sons had a fair market value of $3 million. Its liquidation value if it were sold for scrap was $2.5 million. Alternatively, if sold as a "permanently moored facility," the McKee Sons would have a value of $5 million. However, if the McKee Sons were repaired, such that it was operational and in class with all its certificates, its fair market value would have been $14 million with a liquidation value of $11 million.

Given the wide gap in valuation and repair estimates, the parties heatedly debated the meaning of the phrase "then value" in ¶ 15(a) of the charter agreement. GRNC contended that ¶ 15(a) was unambiguous and that it applied to the facts of this case because the McKee Sons' value at the time of the special survey—without repairs—was exceeded by the costs of the repairs needed, including the year-one repairs as well as repairs that could be performed in later years. LSSC took the position that ¶ 15(a) was ambiguous and could be read to refer to the McKee Sons's value *after* repairs are made. LSSC also argued that the repairs at issue were the year-one repairs required at the time of the 2013 survey, not additional repairs mapped out in the 10-year plan. GRNC sought a directed verdict on this issue, just as it had sought summary disposition. The trial court denied GRNC's motion. The trial court concluded that ¶ 15(a) was ambiguous and instructed the jury on the interpretation of ambiguous contracts consistent with the Michigan civil jury instructions.

The jury found that GRNC had breached the charter agreement "in one or more ways" and awarded LSSC $11,825,685 in damages. The trial court subsequently denied GRNC's motions for judgment notwithstanding the verdict (JNOV), a new trial, or remitter. GRNC now appeals.

## II. ANALYSIS

As noted, GRNC filed motions for summary disposition, directed verdict, and JNOV, all of which were denied by the trial court. We review these decisions de novo. *Foreman v Foreman*, 266 Mich App 132, 135; 701 NW2d 167 (2005). We review for an abuse of discretion the trial court's denial of GRNC's request for a new trial. *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 223; 755 NW2d 686 (2008). In considering these motions, we must review the evidence in the light most favorable to the nonmoving party to determine whether there existed a material factual question for the jury's consideration, and we may not substitute our judgment for the jury's when reasonable jurors could disagree on the evidence. See *Anaya v Betten Chevrolet, Inc*, 330 Mich App 210, 215-216; 946 NW2d 560 (2019) (directed verdict); *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 545-546; 854 NW2d 152 (2014) (JNOV); *Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (summary disposition under MCR 2.116(C)(10));

*Taylor v Kent Radiology, PC*, 286 Mich App 490, 525; 780 NW2d 900 (2009) (a motion for new trial is based on the great weight of the evidence, and we give deference to the finder of fact).

GRNC's challenges are based on the interpretation of the charter agreement. We review de novo legal questions regarding the proper interpretation of a contract, "including whether the language of a contract is ambiguous and requires resolution by the trier of fact." *DaimlerChrysler Corp v G Tech Prof Staffing, Inc*, 260 Mich App 183, 184-15; 678 NW2d 647 (2003). GRNC's challenges also involve the instructions provided to the jury. We review de novo legal questions regarding jury instructions, but review for an abuse of discretion a trial court's determination whether an instruction applies to the facts of a case. *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 223; 755 NW2d 686 (2008).

## A. "THEN VALUE" IN ¶ 15(a) IS AMBIGUOUS

We begin with GRNC's challenges based on ¶ 15(a) of the charter agreement.

A charter party contract is "maritime in nature." *Simon v Intercontinental Transp (ICT) BV*, 882 F2d 1435, 1441 (CA 9, 1989). Federal common law regarding maritime contracts governs the interpretation of the charter agreement. *Norfolk S R Co v Kirby*, 543 US 14, 22-23; 125 S Ct 385; 160 L Ed 2d 283 (2004). Indeed, the charter agreement expressly indicated that it would be governed by federal admiralty law.

When it comes to the identification of contractual ambiguity, federal law differs markedly from Michigan law. In Michigan, we find contractual ambiguities only rarely; " 'ambiguity is a finding of last resort . . . .' " *Kendzierski v Macomb Co*, 503 Mich 296, 311931 NW2d 604 (2019), quoting *Lansing Mayor v Pub Serv Comm*, 470 Mich 154, 165 n 6; 680 NW2d 840 (2004). An ambiguity may be found only when two provisions of the same contract "irreconcilably conflict" with each other. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003).

Under federal law, "[a] contract that is reasonably and fairly susceptible of more than one meaning is said to be ambiguous." *Ingersoll Milling Machine Co v M/V Bodena*, 829 F2d 293, 306 (CA 2, 1987). This standard focuses on whether the competing interpretations of the language in question are equally reasonable, not whether they irreconcilably conflict. Extrinsic evidence cannot be used to find ambiguity; that decision must be made from the four corners of the document. *In re Fitzgerald Marine & Repair, Inc*, 619 F3d 851, 858 (CA 8, 2010). However, once a contract is deemed ambiguous, extrinsic evidence can be relied upon to determine its meaning. *Royal Ins Co of America v Orient Overseas Container Line Ltd*, 525 F3d 409, 422 (CA 6, 2008)

The phrase at issue in this case is short and simple: "then value." The parties agree on the meaning of the word "value": the amount of money that the barge could be sold for in the barge market. The word "then," however, is trickier. There are two equally reasonable interpretations of the phrase when it is construed in the context of the entire agreement.

The phrase "then value" appears in a paragraph of the charter agreement addressing GRNC's obligation to perform "structural repairs" on the barge during the period of the charter, for the purpose of keeping the vessel in seaworthy condition. As noted, other paragraphs—3, 6,

and 11—describe more generally GRNC's duty to actively maintain the barge in seaworthy condition. Read as a whole, the contract communicates that GRNC was contractually bound to keep the barge in good repair and to maintain its seaworthiness. Abundant trial evidence supported that GRNC did not do so. LSSC contended, and the jury found, that by returning the vessel in its condition, GRNC breached the charter agreement. The larger issue, however, is whether GRNC's maintenance obligation included making the structural repairs that were necessary to maintain the vessel's seaworthiness. LSSC sought the cost of these structural repairs and the jury likely included these costs in its large verdict.

Neither side contested that the barge needed structural repair work to pass the five-year survey. GRNC's defense centered on ¶ 15(a) of the charter agreement, which it claimed absolved it from performing the structural repairs required in other provisions of the agreement. As noted, ¶ 15(a) read:

> If at any time during the Term of the Charter under the Agreement the cost of all required structural repairs necessary for [GRNC] to remain in compliance under this Agreement at the time of each five year classification society inspection due to normal wear and tear exceeds the *then value* of the Vessel, the Charter under this Agreement may be terminated by [GRNC] upon 20 days' written notice to [LSSC]. In that event, the hire is to be prorated from the last yearly term payment. [Emphasis added.]

The trial court determined that the meaning of "then value" was ambiguous, as it could relate to the value of the vessel at the time of the five-year survey *before* any needed structural steel repairs were undertaken, or it could also refer to the value of the vessel *after* the structural repairs were accomplished. We discern no error in this assessment. "Then" can refer to a time in the past or the future. For example, "I was living in Southfield then" relates to a past event, while "give me the book next week, I won't have time to read it until then" refers to the future. The question presented here is whether the meaning of "then value" in its context in the charter agreement is reasonably susceptible of more than one plausible interpretation. GRNC urges that "then value" relates to the value of the barge at a singular moment in time: before the undertaking of a five-year survey of the vessel's seaworthiness. At the time of the five-year inspection at issue here, the barge needed millions of dollars of structural steel work. Because GRNC had not properly maintained and repaired the vessel during the years before the survey, the vessel was not seaworthy at that point in time, and its market value had plummeted.

GRNC offers a reasonable interpretation of the contractual language. But a different interpretation—that "then value" relates to the market value of the barge *after* the monetary investment necessary to pass the five-year survey—is also reasonable. Therefore, the "then value" paragraph of the charter agreement is ambiguous.

The trial evidence substantiates that at the time the five-year survey should have occurred, the vessel had fallen into disrepair and was unseaworthy. Viewed in the light most favorable to the jury's verdict, due to GRNC's breach of its maintenance responsibilities, the barge was an inoperable mess. And indisputably, it needed structural repairs.

GRNC claimed that at that point, the value of the ship was $3 million, while the cost of the needed repairs exceeded $4.8 million. The jury was permitted to consider the evidence GRNC marshalled in support of this claim, and GRNC's argument that ¶ 15(a) allowed it to return the vessel without replacing the worn-out steel.[2] LSSC contended that the cost of the structural repairs was between $3.2 and $3.9 million, and that the barge was worth more than that. The jury considered this evidence and LSSC's extrinsic evidence supporting that ¶ 15(a) could not be construed as meaning that the vessel's "then value" was equal to its value before the necessary repairs.

The "then value" sentence of ¶ 15(a) contains two references to time. The first encompasses the entire term of the charter: "If at *any time during the Term of the Charter* under this Agreement the cost of all required structural repairs necessary for [GRNC] to remain in compliance under this Agreement . . . ." (Emphasis added.) The second, which immediately follows, refers to the time of the five-year survey: "[T]he cost of all required structural repairs necessary for [GRNC] to remain in compliance under this Agreement *at the time of each five year classification* [ABS] inspection due to normal wear and tear exceeds the then value of the Vessel . . . ." (Emphasis added.)

Both references to time require consideration, because the individual, discrete words of a contract should be read holistically and within the context of the entire agreement. "[C]ontractual terms must be construed in context and read in light of the contract as a whole[.]" *Auto Owners Ins Co v Seils*, 310 Mich App 132, 148; 871 NW2d 530 (2015) (citations omitted). See also *LLOG Exploration Co, LLC v Signet Mar Corp*, 673 Fed App'x 422, 425 (CA 5, 2016). Interpreted in that spirit, ¶ 15(a) could reflect the parties' intent that the "then value" of the vessel relates to the value "during the time of the charter," or at the time of each five-year survey. The ambiguity is patent, and is reinforced when all the words of this sentence are subjected to a practical analysis consistent with the rest of the charter agreement.

The parties intended that GRNC would maintain and repair the barge as needed to maintain its seaworthiness. This proposition was expressed in ¶¶ 3(a), 3(c), 6, and 11. Another way of looking at this mandate is that GRNC was charged with, and accepted, the obligation to maintain the *value* of the vessel. LSSC expected—and the parties contracted for—the return of a seaworthy barge. In that context, it makes little sense to interpret ¶ 15(a) as a "get out of jail free" card for GRNC, absolving it of its ongoing responsibility to repair and maintain the vessel by allowing it to fall into such disrepair that the cost of fixing it would exceed its damaged and trashed value. Instead, one reasonable interpretation of this paragraph is that the parties intended that "then value" refers to the value of a properly maintained, repaired, and seaworthy vessel, since that is what GRNC agreed to return to LSSC. Given these differing, reasonable interpretations, the trial court did not err in finding an ambiguity.

---

[2] During oral argument on GRNC's motion for a directed verdict, the trial court summarized GRNC's position regarding ¶ 15(a) as follows: "If the jurors find that Paragraph 15(A) applies then that essentially gives you a trump card over other perceived violations, correct?" Counsel for GRNC answered affirmatively.

## B. "ALL REQUIRED STRUCTURAL REPAIRS"

GRNC also challenges the trial court's interpretation of the phrase "all required structural repairs" in ¶ 15(a). GRNC asserts that the phrase refers to all repairs mandated by the five-year survey, but that might not be required until a year or more after the survey. However, GRNC improperly isolates the phrase from its context in ¶ 15(a). The relevant language refers to "the cost of all required structural repairs necessary for [GRNC] to remain in compliance under this Agreement at the time of each five year classification society inspection due to normal wear and tear." This language is clear and contains an unambiguous temporal limitation. That is, the relevant costs are those for repairs required to remain in compliance "at the time" of the five-year survey. Any repairs that will not be required by the ABS until later years are, by definition, not required to remain in compliance "at the time" of the survey. Accordingly, GRNC could not rely on the higher cost of repairs that it deemed would be required at later years in its 10-year plan to inflate the cost of repairs over the then-value of the vessel.

## C. BREACH OF OTHER PROVISIONS

As GRNC could not rely on ¶ 15(a) to prematurely terminate the charter agreement, we need not address its claim that ¶ 15(a) negated all of its contractual duties and thereby defeated all of LSSC's breach of contract claims. Ultimately, the charter agreement remained in place and GRNC was required under several contractual provisions to maintain and repair the vessel. Given the deplorable condition in which the McKee Sons was returned to LSSC, the jury easily could determine that GRNC failed to perform as the contract required. Indeed, by its own admissions, GRNC stopped all maintenance in December 2012, long before it gave notice of its intent to terminate the contract.

## D. SUBSTANTIAL BREACH DOCTRINE

GRNC further complains that the trial court improperly instructed the jury on the first-substantial-breach doctrine, which LSSC allegedly invoked to preclude GRNC's reliance on ¶ 15(a) to terminate the agreement. GRNC mischaracterizes the record.

At trial, LSSC specifically requested an instruction to the effect that "a party who breaches a contract cannot in turn . . . rely upon terms of the contract to justify its breach." GRNC objected, asserting that LSSC was attempting to invoke the first-substantial-breach doctrine, which did not apply. The trial court agreed with GRNC, concluding that the doctrine did not apply to the facts of this case and declined to give LSSC's proposed instruction.

The trial court did, however, instruct the jury on the parties' respective theories of the case. LSSC's theory of the case stated, in part:

> [LSSC] contends that [GRNC's] reliance on [¶ 15(a)] is misplaced for the reason that, one, [GRNC] was in breach of the [charter party agreement] for nearly two years prior to the alleged terminations and, two, the cost of the necessary structural repairs for the vessel did not exceed here—quote: then value, as the phrase is commonly used.

-8-

GRNC objected to this statement of LSSC's theory, asserting that this argument implicated the substantial-breach doctrine, which the trial court had already ruled inapplicable. The trial court overruled GRNC's objection and read LSSC's theory of the case, including the language set forth above. However, the court asked LSSC's counsel to refrain from using language to suggest that GRNC's breach before termination was a "disqualifier" that precluded invocation of ¶ 15(a). Counsel complied with that request. When reading the parties' theories, the trial court specifically instructed the jury that they were the parties' theories of the case and that the court had no preference for either theory. The jury was also told that the court would instruct it on the law and that the jury must "take the law" as instructed by the court.

Considering the trial court's rulings and instructions, GRNC is not entitled to relief. GRNC received the relief it requested—the trial court did not instruct the jury on the first substantial breach doctrine. There is no further relief this Court could provide. See *People v Miller (After Remand)*, 211 Mich App 30, 42-43; 535 NW2d 518 (1995) ("[D]efendant objected below, and the court struck the testimony. Defendant has already received his relief.").

Moreover, to the extent LSSC's theory of the case discussed the interplay between ¶ 3(a) and ¶ 15, there was no error. Contrary to GRNC's arguments, ¶ 15(a) is not a trump card that retroactively cures prior breaches unrelated to the structural repairs at issue in ¶ 15(a). LSSC's theory that GRNC was in breach of ¶ 3(a) for two years before attempting to invoke ¶ 15(a) was entirely consistent with the evidence and the charter agreement. Also contrary to GRNC's arguments, LSSC's theory of the case did not implicate the substantial-breach doctrine; that is, after the trial court made its ruling, LSSC did not argue that GRNC's prior breach precluded or disqualified it from invoking ¶ 15(a). And, in any event, the trial court's jury instructions were clear. The parties' theories of the case were simply the parties' theories. The jury was instructed to apply the law as given to it by the judge. Jurors are presumed to follow their instructions. *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 109; 776 NW2d 114 (2009).

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause