*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEFFREY THOMAS WILLIS,

        Defendant-Appellant.

UNPUBLISHED
January 2, 2020

No. 341913
Muskegon Circuit Court
LC No. 16-003145-FC

Before: METER, P.J., and O'BRIEN and TUKEL, JJ.

PER CURIAM.

A jury convicted defendant of first-degree murder, MCL 750.316;[1] and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life imprisonment for first-degree murder and a consecutive two years' imprisonment for felony-firearm. Defendant appeals as of right. We affirm.

## I. BASIC FACTS

Defendant's convictions arise from the murder of 36-year-old Rebekah Bletsch, who was shot to death while walking or jogging near her home on June 29, 2014. Bletsch was found on the side of the road with her clothes askew—her shirt was "up a little bit" and her "bottoms were down a little bit." The prosecutor's theory of the case was that defendant intended to abduct Bletsch at gunpoint, possibly incapacitate her with insulin, transport her to an empty house at 3038 Bailey, and then rape and murder her. The prosecution theorized that defendant shot Bletsch during the attempted abduction because she tried to get away, and that defendant also touched Bletsch in some manner, at least enough to get her DNA on his glove.

---

[1] The jury convicted defendant of first-degree murder on two theories: premeditation, MCL 750.316(1)(a), and felony-murder, MCL 750.316(1)(b). His judgment of sentence specifies that his murder conviction is for one count of first-degree murder supported by two theories.

During an 11-day trial, the prosecution called dozens of witnesses and submitted hundreds of exhibits. Among other forensic evidence, the prosecutor offered evidence establishing (1) that the murder weapon, a stolen .22-caliber Walther pistol with defendant's DNA on it and the serial number obscured, was found in a locked lockbox in defendant's van, (2) that a Reebok glove, with both Bletsch's and defendant's DNA on it, was found in a locked toolbox in defendant's van, and (3) that a purple dildo vibrator, with both Bletsch's and defendant's DNA on it, was found in a locked toolbox in defendant's van. Collectively, the toolbox and lockbox comprised what the prosecutor characterized as a "rape kit," containing items such as handcuffs, rope, restraints, chains, sex toys, a gag, lubricating jelly, insulin, syringes, a human anatomy diagram with injection points, gloves, Viagra, cameras, and bullets. Fingerprints, DNA evidence, and defendant's testimony at trial established defendant as the owner of the lockbox and toolbox, and a note in defendant's handwriting, found at 3038 Bailey, set forth what the prosecutor characterized as a "rape kit checklist" for many of the items in the toolbox as well as additional items.

At trial, the prosecutor introduced other-acts evidence relating to (1) the disappearance of Jessica Heeringa on April 26, 2013, and (2) the attempted abduction and escape of MJN on April 16, 2016. During analysis of defendant's external computer hard drives, authorities found a folder labeled "vics," with subfolders specific to Bletsch and Heeringa; the folders were labeled by Bletsch's and Heeringa's initials and the dates of the crimes against them. In the folder labeled for Bletsch, defendant had photographs of Bletsch downloaded from Facebook, and shortly after Bletsch's murder, defendant saved items—such as phone records—in support of a potential alibi for the time of Bletsch's death.

In contrast to the prosecution, the defense theory of the case was that defendant's cousin, Kevin Bluhm, stalked Bletsch and then murdered her using a gun he borrowed from defendant. According to the defense theory, after the murder, Bluhm returned the gun to defendant and also loaned defendant Reebok gloves that Bluhm wore during the murder. The defense maintained that Bletsch's DNA from the gloves then transferred to the purple vibrator while both items were in the toolbox. The jury convicted defendant as noted. Defendant now appeals as of right.

## II. INTERFERENCE WITH ATTORNEY-CLIENT PRIVILEGE

On appeal, defendant first argues that the trial court erred by denying defendant's motion to dismiss on the basis of governmental interference with his Sixth Amendment right to counsel. Defendant maintains that the government infringed on his right to counsel by violating the attorney-client privilege when (1) authorities took and did not return defendant's notes for counsel taken from the pocket of his jail jumpsuit, (2) authorities made copies of a legal pad in his jail cell, and (3) authorities looked in an envelope in defendant's jail cell bearing the name of the public defender's office and the phrase "confidential attorney mail." Defendant filed a motion to dismiss on the basis of these events, and the trial court held a hearing at which defendant and the officers involved testified. Following the hearing, the trial court made factual findings and ultimately denied defendant's motion to dismiss. We conclude that the trial court did not abuse its discretion by denying defendant's motion to dismiss.

A trial court's decision on a motion to dismiss is reviewed for an abuse of discretion. *People v Patton*, 325 Mich App 425, 431; 925 NW2d 901 (2018). An abuse of discretion

-2-

"occurs when the court chooses an outcome that is outside the range of reasonable and principled outcomes." *Id*. "Generally, whether a defendant's right to counsel was violated is a constitutional issue that this Court reviews de novo." *People v Hieu Van Hoang*, 328 Mich App 45, 54-55; ___ NW2d ___ (2019). Whether the attorney-client privilege applies is a legal question reviewed de novo. *Leibel v Gen Motors Corp*, 250 Mich App 229, 236; 646 NW2d 179 (2002). See also *People v Carrier*, 309 Mich App 92, 104; 867 NW2d 463 (2015). What constitutes a waiver of attorney-client privilege is also a question of law reviewed de novo. *Leibel*, 250 Mich App at 240.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Id.* at 237 (quotation marks and citations omitted).

> The attorney-client privilege attaches to communications made by a client to his or her attorney acting as a legal adviser and made for the purpose of obtaining legal advice on some right or obligation. The purpose of the privilege is to allow a client to confide in his or her attorney secure in the knowledge that the communication will not be disclosed. The privilege is personal to the client, who alone can waive it. [*People v Waclawski*, 286 Mich App 634, 693-694; 780 NW2d 321 (2009) (citations omitted).]

"[S]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." *Howell v Trammell*, 728 F3d 1202, 1222 (CA 10, 2013) (quotation marks and citation omitted). Nevertheless, courts have acknowledged that to meaningfully implement the right to counsel, privacy of communication with counsel is essential. See *Weatherford v Bursey*, 429 US 545, 554 n 4; 97 S Ct 837; 51 L Ed 2d 30 (1977); *United States v Brugman*, 655 F2d 540, 546 (CA 4, 1981). It follows that a violation of the attorney-client privilege may implicate a defendant's Sixth Amendment right to counsel "when the government interferes with the relationship between a criminal defendant and his attorney." *Howell*, 728 F3d at 1222 (quotation marks and citation omitted; emphasis omitted).

To establish a constitutional violation of the Sixth Amendment right to counsel arising from interference with the attorney-client privilege, "a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant . . . or created a substantial threat of prejudice." *United States v Singer*, 785 F2d 228, 234 (CA 8, 1986). "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *United States v Danielson*, 325 F3d 1054, 1069 (CA 9, 2003), as amended (May 19, 2003) (quotation marks and citation omitted).

> The courts have enunciated several factors to determine whether there has been an invasion of the attorney-client privilege in violation of the Sixth Amendment right to effective assistance of counsel. . . . These include: 1)

whether the [challenged action[2]] was purposely caused by the government in order to garner confidential, privileged information, or whether the [challenged action] was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the . . . intrusion; 3) whether any information gained . . . was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the prosecutor. [*United States v Steele*, 727 F2d 580, 585-586 (CA 6, 1984).]

Even if a defendant establishes a constitutional violation of the right to counsel arising from interference with the attorney-client relationship, it does not follow that dismissal is the appropriate remedy. *Singer*, 785 F2d at 234. Instead, when faced with a violation, the court should "tailor a remedy to the injury suffered, to assure the defendant effective assistance of counsel in a subsequent proceeding." *Id*. See also *United States v Morrison*, 449 US 361, 365-366; 101 S Ct 665; 66 L Ed 2d 564 (1981) (recognizing that the remedy for a constitutional violation, such as deprivation of counsel, is to "neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial").

Applying these principles, the trial court did not err by concluding that defendant had not shown interference with his attorney-client relationship that amounted to a constitutional violation of his right to counsel.

When addressing the notes in the pockets of defendant's jumpsuit and the legal pad left out in his cell, the trial court reasonably concluded that defendant could not establish that these documents were subject to the attorney-client privilege because *defendant* failed to take reasonable precautions to keep the papers confidential. Cf. *People v Compeau*, 244 Mich App 595, 597; 625 NW2d 120 (2001) (concluding that a defendant's conversation with his attorney that was held in a manner that could be overheard was not confidential and, therefore, not privileged). For the notes in the jumpsuit, the trial court pointed out that defendant sent them with his jumpsuit to the laundry, where they were found during a routine inspection of laundry items. As for the legal pad in defendant's cell, defendant did not waive his attorney-client privilege simply by keeping the materials in his cell, but he did by treating the notes "in such a careless manner as to negate [his] intent to keep them confidential." *DeFonte*, 441 F3d at 94-95. As detailed by the trial court, defendant kept the "pad on the shelf in open view" with "no precautions," despite "knowledge that his cell could be searched and similar materials may have previously been examined." Moreover, nothing on the legal pad indicated it was confidential material intended for defendant's attorney. Indeed, it also contained information unrelated to his

---

[2] While cases involving governmental intrusion on the attorney-client relationship often involve efforts to have an informant present during an attorney-client meeting, caselaw supports that the government may also impermissibly interfere with the attorney-client relationship by obtaining a defendant's written communications. See, e.g., *United States v DeFonte*, 441 F3d 92, 95 (CA 2, 2006) (considering a defendant's journal); *Bishop v Rose*, 701 F2d 1150, 1156-1157 (CA 6, 1983) (involving a 14-page handwritten document).

case, including menus, commissary information, names and addresses, and Bible quotes. And, as emphasized by the trial court, defendant left the legal pad out while intentionally "segregate[ing] material in his cell that he wished to be confidential" by "placing [those other] materials in an envelope marked 'public defender' and 'confidential attorney mail'." Overall, the trial court's factual findings demonstrate that defendant treated the legal pad, as well as the notes in his jumpsuit pocket, in such a careless manner as to negate any intent to keep them confidential. See *id*. Cf. *Gomez v Vernon*, 255 F3d 1118, 1133 (CA 9, 2001) (detailing precautions taken by prisoners to retain attorney-client privilege and keep documents confidential). In these circumstances, he cannot show that the government impermissibly intruded on the attorney-client relationship because he cannot establish that the notes were subject to the attorney-client privilege.[3]

On appeal, defendant characterizes any disclosure on his part as inadvertent, and he correctly notes that the attorney-client privilege is not waived by inadvertent disclosure, but instead requires a "true waiver" of the privilege. See *Franzel v Kerr Mfg Co*, 234 Mich App 600, 616; 600 NW2d 66 (1999). But that defendant's disclosure of these materials was arguably inadvertent does not aid defendant's position because his claim is one for a constitutional violation of the right to counsel, and he cites no authority for the proposition that the government violates a defendant's right to counsel when a defendant's own inadvertence leads to disclosure of attorney-client materials. Indeed, caselaw supports the opposite—a defendant cannot maintain a claim for impermissible intrusion on the attorney-client relationship amounting to a violation of the right to counsel when the alleged violation was the result of "other inadvertent

---

[3] Even if the notes in defendant's jumpsuit and on his legal pad were privileged, defendant cannot establish a violation of his attorney-client privilege implicating the Sixth Amendment. As noted, to maintain such a claim, "a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant . . . or created a substantial threat of prejudice." *Singer*, 785 F2d at 234. Relevant to the first requirement, the trial court credited testimony from deputies that defendant "never advised any corrections officer that [the notes in defendant's jumpsuit] were an attorney/client communication." Regarding the September 2, 2016 search involving defendant's legal pad, the trial court found that defendant did not advise authorities he had confidential materials in the cell and that nothing about the legal pad suggested that it contained confidential materials. More generally, the trial court emphasized that "there is no evidence that the task force purposely sought out confidential communications." Given these factual findings, defendant's constitutional claim fails because he has not shown that the government *knowingly* intruded on his attorney-client relationship. As for the second requirement, the notes and legal pad in question were not used against defendant at trial, the items were not given to the prosecutor, and, as found by the trial court, there is simply no indication that the prosecutor gleaned any new information or information about the defense strategy from the communications. See *Steele*, 727 F2d at 585-586; *United States v Dobson*, 626 Fed App'x 117, 125 (CA 6, 2015). See also *Weatherford*, 429 US at 558 ("There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion . . . , there was no violation of the Sixth Amendment . . . .").

occurrences" and not the government's purposeful conduct. See *Steele*, 727 F2d at 585-586. See also *Maine v Moulton*, 474 US 159, 176; 106 S Ct 477; 88 L Ed 2d 481 (1985) ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached.").[4]

Defendant's other set of notes viewed by authorities—the ones in defendant's cell contained within an envelope plainly labeling them confidential—presents a somewhat different question. Although the envelope clearly conveyed the confidential nature of the materials, jail officials looked inside the envelope on two occasions. Given defendant's efforts to maintain the confidentiality of the materials in the envelope by marking it "public defender" and "confidential attorney mail," the trial court correctly recognized that defendant preserved the confidentiality of these papers and that the attorney-client privilege attached to these materials. Cf. *Gomez*, 255 F3d at 1133. Nevertheless, although officers looked inside this clearly marked envelope, defendant has not shown a constitutional violation of his right to counsel.

First, although deputies deliberately looked inside the envelope, they did not do so to interfere with defendant's attorney-client relationship. Sergeant Todd Gilchrist testified that, during the September search, he was looking for contraband; Sergeant Eric Rideout testified that, during the October search, he looked in the envelope for names and information about deputies and their families amid security concerns that defendant was trying to compile this type of information. Generally, a jail or prison has "a penological interest in curtailing the prisoner's privacy rights," *id.*, including an interest in searching for contraband, even in items bearing an attorney's name, see *Wolff v McDonnell*, 418 US 539, 577; 94 S Ct 2963; 41 L Ed 2d 935 (1974); *Sallier v Brooks*, 343 F3d 868, 874 (CA 6, 2003). The trial court, as a factual matter, credited the jail officials' reasons for the searches of the envelope. In view of these legitimate justifications for opening the envelope, defendant cannot show that the government acted purposefully in order to garner confidential information. See *Steele*, 727 F2d at 585-586; *United States v Moses*, 337 Fed App'x 443, 449 (CA 6, 2009).

---

[4] Even as an evidentiary matter, defendant's "true waiver" argument ignores the "dual nature" of the attorney-client privilege, which includes "*both* the security against publication *and* the right to control the introduction into evidence of such information or knowledge communicated to or possessed by the attorney." *Franzel*, 234 Mich App at 615-616 (emphasis added). See also *Sterling v Keidan*, 162 Mich App 88, 91-96; 412 NW2d 255 (1987). Although "true waiver" standards apply to a determination whether the right to control the introduction of privileged matter into evidence has been destroyed, inadvertent disclosure eliminates "any security against publication." *Franzel*, 234 Mich App at 616. Stated more simply, if a party inadvertently discloses privileged information, he may nevertheless be able to assert the privilege to prevent the introduction of the evidence at trial, but having lost the security against publication, he cannot expect those to whom he unintentionally disclosed the information to un-see it, and he cannot plausibly expect that his case will be dismissed as a remedy for his own inadvertent disclosures. See generally *id.* at 615-616; *Sterling*, 162 Mich App at 95-96.

Second, defendant cannot show any prejudice arising from the search of the envelope. Neither Sergeant Gilchrist nor Sergeant Rideout was involved with the investigation of defendant's crimes, they did not share the information they saw in the envelope with the investigators or the prosecutor, and they did not even recall the information that they saw in the envelope. In other words, the government, and in particular the prosecutor, did not obtain any evidence, or any information about the defense strategy, for use at trial against defendant or to use in any way to defendant's detriment. See *Steele*, 727 F2d at 585-586.

Third, and finally, recognizing that the jail officials viewed information in a confidential envelope, the trial court took action to remedy any infraction and prevent any potential prejudice to defendant. The trial court ordered (1) that the materials in the envelope would not be admitted at trial, (2) that the jail officials who viewed the materials were enjoined from relaying the information to anyone, and (3) that the prosecutor was enjoined from receiving any such information. This remedy neutralized any potential taint caused by opening the envelope and assured that defendant would receive a fair trial with the effective assistance of counsel. See *Singer*, 785 F2d at 234. See also *Morrison*, 449 US at 365-366. On these facts, defendant was not entitled to dismissal of the charges.

In sum, the trial court did not abuse its discretion by denying defendant's motion to dismiss because he failed to establish a governmental invasion of his attorney-client privilege amounting to a violation of his constitutional right to counsel.

III. MOTION TO SUPPRESS

Defendant argues that the trial court erred by denying his motion to suppress evidence found on his electronic devices because, according to defendant, there was not probable cause to search his electronic devices and the warrant for his electronic devices was overly broad. The trial court denied defendant's motion to suppress on the basis of the good-faith exception to the exclusionary rule, but defendant contends that the exception is inapplicable. We disagree.

We review de novo a trial court's ultimate decision on a motion to suppress. *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016). The trial court's factual findings on the motion are reviewed for clear error. *Id.* A finding of fact is clearly erroneous if, after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made. *Id.* Whether the Fourth Amendment was violated and whether the exclusionary rule applies are questions of law reviewed de novo. *Id.*

The United States and Michigan Constitutions protect against unreasonable searches and seizures. US Const Am IV; Const 1963, art I, § 11. "A search or seizure is considered unreasonable when it is conducted pursuant to an invalid warrant or without a warrant where the police officer's conduct does not fall within one of the specific exceptions to the warrant requirement." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). "Ordinarily, if a warrant is determined to be invalid because it lacked a probable-cause basis or was technically deficient in some other manner, any evidence seized pursuant to that warrant, or seized subsequently as a result of the initial illegal search, is inadmissible as substantive evidence in related criminal proceedings." *Id.* at 193.

However, there are exceptions to the exclusionary rule, including the good-faith exception adopted by the Michigan Supreme Court in *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004). In adopting the good-faith exception, the Court explained that "[t]he purpose of the exclusionary rule is to deter police misconduct," *id.*, and "the goal of the exclusionary rule would not be furthered where police officers act in objectively reasonable good-faith reliance on a search warrant," *id.* at 538. Under the good-faith exception, searches "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Hellstrom*, 264 Mich App at 197 (quotation marks and citation omitted). However, there are times when an officer will have no reasonable grounds for believing that the warrant was properly issued. See *id.* As summarized by this Court:

> Reliance on a warrant is reasonable even if the warrant is later invalidated for lack of probable cause, except under three circumstances: (1) if the issuing magistrate or judge is misled by information in the affidavit that the affiant either knew was false or would have known was false except for his or her reckless disregard of the truth; (2) if the issuing judge or magistrate wholly abandons his or her judicial role; or (3) if an officer relies on a warrant based on a "bare bones" affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. [*People v Czuprynski*, 325 Mich App 449, 472; 926 NW2d 282 (2018) (citation omitted).]

The good-faith exception may also not apply when, "depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v Leon*, 468 US 897, 923; 104 S Ct 3405; 82 L Ed 2d 677 (1984).

When ruling on a motion to suppress, a court is not required to first evaluate the validity of a warrant, but may instead choose to " 'turn[] immediately to a consideration of the officers' good faith.' " *Hellstrom*, 264 Mich App at 199, quoting *Leon*, 468 US at 925. "[T]he good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Hellstrom*, 264 Mich App at 197-198 (quotation marks and citation omitted).

When the trial court ruled on defendant's motion to suppress, it did not address the validity of the warrant, and instead turned immediately to the question of good faith. It determined that the officers conducting the search of defendant's home and electronic devices acted in good-faith reliance on the warrant. For the reasons explained below, the trial court's reasoning was sound. Defendant has not shown clear error in the trial court's factual findings, and those findings support the trial court's conclusion that the exclusionary rule does not apply.

Undisputedly, the police had a warrant for the search, and this is not a case where officers lacked reasonable grounds for believing the warrant was valid. See *id.* at 199. There is no indication that the affidavits contained false information, and there is no suggestion that the judge signing the warrant abandoned his judicial role. See *Czuprynski*, 325 Mich App at 472. Moreover, the warrant was not facially deficient; it specified the place to be searched and

provided a detailed list of the items to be seized, including electronic devices. See *Leon*, 468 US at 923. Further, the affidavits were detailed, and certainly cannot be described as "bare bones" affidavits "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Czuprynski*, 325 Mich App at 472.

The warrants were issued after defendant attempted to kidnap a minor, MJN, and defendant's main challenge to the warrant seems to be his belief that MJN's kidnapping had no connection to the electronic devices. But in his affidavit in support of the warrant, Detective Matt Schultz specified, on the basis of his knowledge and experience, that individuals engaging in these types of behaviors (kidnapping) tend to follow media reports about their crimes, which the trial court aptly recognized are likely to be stored electronically. Cf. *Hellstrom*, 264 Mich App at 199 & n 7 (applying good-faith exception when affiant had personal knowledge that "pedophiles generally possess pornographic images" and noting that "[a]n affiant's representations based on his experience can be considered in determining whether probable cause exists"). Furthermore, the affidavit dated May 12, 2016, detailed information suggesting that defendant was engaged in stalking-type behavior, including videotaping and following women. Considered in conjunction with defendant's abduction of MJN, information about defendant's videotaping of women provided further reason to believe that evidence of a crime would be found on defendant's electronic devices. Cf. *id*. at 199-200. On these facts, "[t]he supporting affidavits were not so lacking in indicia of probable cause that the officers could not objectively believe that the warrant was supported by probable cause." *Id*. at 199 (quotation marks and citation omitted). In these circumstances, the trial court properly refused to apply the extreme sanction of exclusion.

## IV. OTHER-ACTS EVIDENCE

In his appellate brief as well as his Standard 4 brief, defendant argues that the trial court erred by admitting other-acts evidence involving Heeringa's disappearance, MJN's abduction, the theft of the Walther pistol, and the videotaping of a woman in 2007. According to defendant, the evidence was not sufficiently similar to warrant admission under MRE 404(b) and it should have been excluded as unfairly prejudicial under MRE 403. We disagree.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002). Preliminary questions of law regarding the admissibility of evidence are reviewed de novo. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

Defendant challenges the admission of other-acts evidence under MRE 404(b)(1), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other

crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 404(b) governs evidence of other acts that risks this character-to-conduct inference; the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may otherwise give rise to an inference about the defendant's character. *People v Jackson*, 498 Mich 246, 259; 869 NW2d 253 (2015). The Michigan Supreme Court summarized the framework for admitting evidence under MRE 404(b) as follows:

> First, the prosecutor must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an issue of fact of consequence at trial. Third, under MRE 403, a determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403. Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000) (quotation marks and some citation omitted) (alteration in original).]

Under the MRE 404(b) framework, the prosecutor bears the "initial burden to show that the proffered evidence is relevant to a proper purpose under the nonexclusive list in MRE 404(b)(1) or is otherwise probative of a fact other than the defendant's character or criminal propensity." *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010). Relevance requires consideration of both materiality and probative value. *People v Crawford*, 458 Mich 376, 388-390; 582 NW2d 785 (1998). "[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Hine*, 467 Mich at 251. "[D]istinctive and unusual features are not required to establish the existence of a common design or plan." *Id*. at 252-253. Rather, "[t]he evidence of uncharged acts needs only to support the inference that the defendant employed the common plan in committing the charged offense." *Id*. at 253.

The trial court admitted evidence relating to Heeringa's disappearance and MJN's abduction as relevant to establishing that, when defendant killed Bletsch, he was carrying out a common scheme, plan, or system. The trial court characterized this common scheme as involving (1) young, female victims, (2) who were targeted while they were isolated and (3) threatened or assaulted with a gun. Indeed, the trial court noted that there was evidence to support the conclusion that defendant used the same gun in each case.[5] The trial court also

---

[5] Bletsch was killed with the Walther pistol found in defendant's van; MJN testified that defendant retrieved a gun from under his seat, which is where he stored the Walther pistol; and the battery cover for a Walther laser sight was recovered at the gas station where Heeringa

emphasized that the offenses took place within a three-year period within Muskegon County. Additionally, the evidence suggests that defendant used a vehicle—namely, his van—to carry out his scheme; the evidence showed that Heeringa was taken away in a van, MJN escaped abduction by jumping from a van, and Bletsch was found shot on the side of the road in an isolated location, supporting the inference that defendant drove to that location. Further supporting that inference was the officers' finding of defendant's "rape kit," which held items with Bletsch's DNA on them, in defendant's van. The evidence also supported the conclusion that defendant's plan was to abduct the women: defendant drove MJN in a direction she did not wish to go; Heeringa was taken from her place of employment with her belongings left behind; and Bletsch was found on the side of the road with her belongings neatly placed on the roadway as though she had been told to leave them behind. Also, the "vics" folders related to Bletsch and Heeringa, created after their deaths, suggested that part of defendant's plan included compiling information on those victims he succeeded in killing.

Considering the similarities, the trial court did not err by determining that the other-acts evidence was relevant to whether Bletsch's death occurred during a manifestation of defendant's common plan. This is true even if defendant's plan to abduct isolated women at gunpoint and take them away in his van is not particularly distinctive or unusual and there were some dissimilarities between the cases—"a high degree of similarity is not required, nor are distinctive or unusual features required to be present in both the charged and the uncharged acts." *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). Given the similarities between the cases, the trial court did not abuse its discretion by concluding that the evidence relating to Heeringa and MJN was logically relevant to establish a common plan, scheme, or system.

Contrary to defendant's arguments, the trial court also did not abuse its discretion by declining to exclude the evidence under MRE 403. "Rule 403 does not prohibit prejudicial evidence; only evidence that is unfairly so. Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Crawford*, 458 Mich at 398. The other-acts evidence establishing that defendant was engaged in a common scheme to abduct Bletsch was highly probative on the significant questions whether defendant murdered Bletsch, whether he acted with premeditation and deliberation, and, with regard to the felony-murder charge, whether he killed her in the course of an attempted kidnapping. Indeed, the trial court emphasized the need for the other-acts evidence to establish defendant's plan given that there were no eyewitnesses to Bletsch's murder. Although recognizing that there was a potential for prejudice, the trial court found that this potential for prejudice did not substantially outweigh the probative value of the evidence given the similarity of the three crimes, particularly when all the events occurred in close temporal proximity in the same county. The trial court also emphasized the reliability of the other-acts evidence, noting that the evidence consisted, in large part, of reliable physical evidence. See *People v Watkins*, 491 Mich 450, 487; 818 NW2d 296 (2012) (identifying the need for the other-acts evidence, similarity between the acts, temporal proximity, and reliability of the other-acts

---

disappeared, and the gun that defendant stole from his coworker (as will be described in more detail later in this opinion) originally had a laser sight attached.

evidence as considerations relevant to MRE 403 analysis). The trial court is in the best position to make MRE 403 determinations on the basis of a contemporaneous assessment of the presentation, credibility, and effect of testimony. *Mardlin*, 487 Mich at 627. On the facts of this case, the trial court did not abuse its discretion by determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Further, the trial court minimized the potential for prejudice by instructing the jury on the use of other-acts evidence, prohibiting the jury from using the evidence to decide that defendant was a "bad person" or "likely to commit crimes," and informing the jurors that they could not convict defendant because the jurors believed he was "guilty of other bad conduct." See *People v Orr*, 275 Mich App 587, 593; 739 NW2d 385 (2007). Overall, the trial court did not abuse its discretion by admitting other-acts evidence relating to Heeringa's disappearance and MJN's abduction.[6]

On appeal, defendant also challenges the admission of evidence that defendant stole the Walther pistol and some underwear from a coworker's home. In support of admitting this evidence, the prosecutor argued—and the trial court accepted—that the thefts completed the story of how the crime was accomplished because they explained how defendant obtained the gun. The prosecutor also contended, and the trial court agreed, that this evidence was probative of defendant's identity as the killer, and tended to establish that he knowingly possessed the weapon for purposes of the felony-firearm charge. Defendant asserts that the trial court's decision to admit this evidence was an abuse of discretion because, under *Jackson*, 498 Mich at 265-276, other-acts evidence may not be admitted simply to "complete the story."[7] Defendant's argument is without merit.

Relevant to defendant's argument, in *Jackson*, 498 Mich at 265-276, the Supreme Court made clear that there is "no res gestae exception" under MRE 404(b) that would allow admission of evidence to "complete the story" *without first* subjecting the evidence to the MRE 404(b) analysis. The *Jackson* Court did *not* categorically preclude the admission of other-acts evidence to "complete the story;" it instead recognized that such "complete the story" evidence may be relevant and admissible so long as it satisfies MRE 404(b). See *id.* at 276 n 11.

The trial court did not apply a res gestae exception when admitting evidence about the theft of the gun and underwear to complete the story of the crimes. Instead, the trial court

---

[6] In his Standard 4 brief, defendant also argues that the prosecutor should not have been allowed to present this other-acts evidence because the other acts consisted of unproven conduct for which defendant had not yet been convicted. This argument is without merit. Admission of other-acts evidence under MRE 404(b) does not require a conviction relating to the other-acts conduct. See *People v Kelly*, 317 Mich App 637, 646 n 3; 895 NW2d 230 (2016).

[7] Defendant also contends that the thefts were not admissible because they are not part of a common plan or scheme. However, the trial court did not admit the evidence on this basis. MRE 404(b) sets forth a nonexhaustive list of proper purposes, and although there must be "at least one proper noncharacter-based inference linking the prior act to the ultimate inference," *Crawford*, 458 Mich at 390 n 8, there is no requirement that the evidence establish a common plan or scheme.

properly subjected the evidence to analysis under MRE 404(b). In concluding that the evidence was admissible under MRE 404(b), the trial court emphasized that defendant's possession of the gun was directly probative of his identity as the killer and his knowing possession of the gun. Cf. *People v Hall*, 433 Mich 573, 580-581; 447 NW2d 580 (1989) ("Evidence of a defendant's possession of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense."). The trial court also noted that defendant's theft of the gun completed the story of how he accomplished the crime. Indeed, that defendant stole the weapon, failed to register it, and obliterated its serial number were all relevant to assess defendant's premeditated plan to avoid detection. See generally *People v McGhee*, 268 Mich App 600, 613; 709 NW2d 595 (2005) (concluding that other-acts evidence relating to attempts to avoid capture was admissible); *People v Parker*, 76 Mich App 432, 450; 257 NW2d 109 (1977) ("Determination of the source of a weapon in a murder prosecution is relevant to the case . . . .") (quotation marks and citation omitted). Regarding the theft of the coworker's underwear, the trial court reasoned that the evidence was offered for the noncharacter purpose of showing how defendant obtained the murder weapon—the coworker kept her laundry near the gun, and the underwear was found in the shed with defendant's and the coworker's DNA on it. The trial court did not abuse its discretion in determining that the thefts were relevant and offered for a proper purpose.

The trial court also addressed the theft evidence under MRE 403, concluding that the prejudicial effect of the evidence did not outweigh its probative value. The evidence was highly probative to establishing defendant's possession of the murder weapon before Bletsch's death and to establishing his identity as the killer. There is nothing to suggest that the highly probative value of this evidence was substantially outweighed by any danger of unfair prejudice—that is, nothing suggests that this evidence would be given undue or preemptive weight by the jury. See *Crawford*, 458 Mich at 398. Thus, the trial court did not abuse its discretion by declining to exclude the evidence under MRE 403. And, overall, the trial court did not abuse its discretion by admitting the evidence of thefts of the gun and underwear under MRE 404(b).

Finally, defendant challenges the admission of evidence that he filmed a woman as she walked through a Sam's Club parking lot in 2007. The trial court excluded this evidence, and the woman in question did *not* testify at trial. Given that the evidence to which defendant objects was not admitted at trial, defendant is not entitled to any relief.[8] See *People v Miller (After Remand)*, 211 Mich App 30, 42-43; 535 NW2d 518 (1995).

---

[8] Although the trial court excluded evidence about the 2007 incident, the trial court did more generally allow introduction of testimony relating to videos recovered on defendant's computer. Defendant does not address the videos on appeal, and it is not clear whether defendant's collection of homemade, voyeuristic videos included images of the woman filmed in 2007. To the extent admission of the videos implicates MRE 404(b), because defendant does not address the videos on appeal, we consider the issue abandoned and need not address it further. See *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009) ("Failure to brief an issue on appeal constitutes abandonment.").

## V. INEFFECTIVE ASSISTANCE

Next, defendant argues that defense counsel provided ineffective assistance by failing to call experts in ballistics and DNA at trial. We disagree.

"To prevail on a claim of ineffective assistance of counsel, a defendant bears a heavy burden to establish that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different." *People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "[T]he failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *Id*. (quotation marks and citations omitted).

Defendant contends that defense counsel at trial should have retained experts in ballistics and DNA evidence. Defense counsel did seek—and receive—approval for funds to hire a ballistics expert at public expense, and defendant also requested detailed discovery regarding the DNA evidence in the case. However, defense counsel did not call a ballistics or DNA expert at trial. Although defendant now contends that counsel's performance was deficient, he has not established the factual predicate of his claim. See *Carbin*, 463 Mich at 600. That is, there is no evidence that a ballistics or DNA expert would have aided the defense. See *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). At most, in support of a motion to remand, and as an attachment to his brief on appeal, defendant offers an affidavit written by *defendant*, asserting that a ballistics expert and DNA expert could have aided his position. This mere speculation by defendant fails to establish that retention of an expert would have altered the outcome of the proceedings.[9] See *Payne*, 285 Mich App at 190; *Ackerman*, 257 Mich App at 455. Accordingly, defendant's ineffective assistance claim must fail.

## VI. PROSECUTORIAL MISCONDUCT

In his Standard 4 brief, defendant argues that the prosecutor withheld exculpatory evidence and allowed a ballistics expert to commit perjury. Defendant raises these issues for the first time on appeal, so they are reviewed for plain error. See *People v Green*, 322 Mich App 676, 681; 913 NW2d 385 (2018). Defendant has not shown plain error.

---

[9] We previously denied defendant's motion to remand. *People v Willis*, unpublished order of the Court of Appeals, entered November 2, 2018 (Docket No. 341913). And we again conclude that the affidavit written by defendant does not constitute a sufficient offer of proof to warrant remand for an evidentiary hearing. See MCR 7.211(C)(1)(a)(*ii*).

Under *Brady*,[10] "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (quotation marks and citation omitted). To establish a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Id*. at 150. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. (quotation marks and citation omitted).

Defendant contends that the prosecutor withheld laboratory reports and chain of custody information relating to the ballistics evidence. According to defendant, the withheld reports were exculpatory insofar as they would have revealed mistakes, undermined the chain of custody, led to the discovery of rebuttal witnesses, and exposed the perjury of the state's ballistics expert. Defendant also argues that flaws in the chain of custody—and changes in packaging, acronyms, and labels—could have been used to impeach and cross-examine witnesses.

Defendant's claims are without merit. First of all, defendant's argument, and the factual basis for that argument, are somewhat difficult to decipher. His argument is not well-briefed, his citations to the lower court record are scarce,[11] it is often unclear what document or documents he is discussing, and at least some of the materials he mentions do not appear to be part of the lower court record (such as a FOIA request defendant asserts he made after trial).[12] This Court will not search the record for factual support for a party's argument, and by failing to identify support in the record for his contentions, defendant has effectively abandoned his claim. See *McRoberts v Ferguson*, 322 Mich App 125, 137; 910 NW2d 721 (2017).

More substantively, defendant's argument appears to center on ballistics reports prepared by Lieutenant Jeff Crump and the chain of custody of the ballistics evidence. Several ballistics reports were admitted at trial, and defendant now claims that these reports and the related chain-of-custody information were withheld from him. However, there is simply nothing in the record to support defendant's assertions that he was not provided with the materials in question or to show that any of the materials were favorable to the defense. See *People v Elston*, 462 Mich 751, 761-762; 614 NW2d 595 (2000). Accordingly, defendant has not shown that the prosecutor suppressed material evidence favorable to the accused, and his *Brady* claim is without merit. See *id*.; *Chenault*, 495 Mich at 149-150.

---

[10] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[11] Indeed, many of his factual assertions are made without any citations in violation of MCR 7.212(C)(7) ("Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court.").

[12] Because these materials are not in the lower court record, they are not part of our review. See *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013).

At most, the record suggests that the prosecutor may have *delayed* in providing defense counsel with one report or, more accurately, an updated version of a report (identified at trial as People's Exhibit 239). At trial, Lieutenant Crump testified that he had "recently" updated this report to correct an error on the original report. According to Lieutenant Crump, the original report mistakenly identified the police agency involved with the case as "MUP" (the Muskegon Police Department) when the agency involved was actually "MCSD" (the Muskegon County Sheriff's Department). Before the updated report was admitted as evidence at trial, the prosecutor provided a copy to defense counsel, defense counsel was given a chance to review the document, and defense counsel indicated that he had no objection to the admission of the report. On this record, even if the prosecutor delayed in providing the updated report, and even if the minor correction to the report could somehow be used for impeachment, defendant's *Brady* claim is without merit because the updated report was admitted at trial and the fact of the acronym correction was presented to the jury. See *United States v Fields*, 763 F3d 443, 458 (CA 6, 2014) ("Where the [prosecutor] ultimately hands over the *Brady* material that could be used to impeach a witness, however, there is no violation so long as the defendant is given [the] impeachment material, even exculpatory impeachment material, in time for use at trial.") (quotation marks and citation omitted; second alteration in original).

To the extent defendant claims that the prosecutor obtained a conviction by knowingly allowing a witness to commit perjury, this argument is without merit. Defendant appears to assert that Lieutenant Crump lied by stating that he updated the report to correct the submitting agency when, in actuality, his original report was correct and there was some nefarious reason for the changes. But there is simply no evidence that Lieutenant Crump lied about the reason for the correction or anything else in his testimony. At most, any inconsistency between Lieutenant Crump's reports was a matter of credibility and a proper subject for impeachment; it does not establish that the prosecutor knowingly presented perjured testimony. See *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998).

## VII. MOTION TO CHANGE VENUE

Defendant also argues on appeal that the trial court erred by denying his motion to change venue given the negative media coverage before trial. The circumstances in this case are very similar to *People v Clark*, 243 Mich App 424, 425-426; 622 NW2d 344 (2000), wherein this Court explained:

> Defendant first argues that the trial court erred in denying his motion to change venue, which was brought on the basis of prejudicial pretrial publicity. However, we conclude that defendant has waived review of this issue. Defense counsel moved for a change of venue before trial. The trial court denied the motion without prejudice, stating that it was willing to reconsider the motion at any time during the jury selection process. A thorough jury selection process ensued, which included lengthy juror questionnaires, the participation of the attorneys in voir dire, and sequestered questioning of each potential juror. Defense counsel never renewed the motion for a change of venue, but, rather, expressed satisfaction with the jury after the jury selection process was completed. Defense counsel's failure to renew the motion and his expression of satisfaction with the jury waived the change of venue issue.

Like the defendant in *Clark*, defendant waived review of his motion to change venue. Before trial, defendant filed a motion to change venue or for modified voir dire. It is of particular note that at a pretrial hearing on the motion, defense counsel stated that defendant was *not* asking the trial court to change venue "at this juncture." Instead, defense counsel agreed that the appropriate course of action would be to see if "we can panel, ah, a good panel." To enable selection of a fair panel, defense counsel requested modifications to jury voir dire, the prosecutor agreed to modified procedures, and the trial court granted defense counsel's requests. The specific procedures included use of a larger than normal jury pool, special jury questionnaires regarding publicity, leeway for attorneys in questioning witnesses, and individual questioning of prospective jurors while the rest of the jury venire waited in the jury assembly room. Questioning by the attorneys during voir dire was thorough and extensive, spanning more than two days. At no time did defense counsel renew the motion to change venue. To the contrary, at the end of voir dire, defense counsel agreed that "we have a jury." By effectively withdrawing his pretrial request to change venue to instead see if a "good panel" could be found, agreeing to modified voir dire procedures, failing to renew his motion to change venue, and then expressing satisfaction with the jury selected after thorough voir dire procedures, defendant has waived review of his motion to change venue. See *id.*; see also *People v Adams*, 245 Mich App 226, 240; 627 NW2d 623 (2001).

## VIII. MOTION TO DISQUALIFY THE PROSECUTOR'S OFFICE

Next, defendant argues that the Muskegon County Prosecutor's Office should have been disqualified after his original attorney, Brian Hosticka, joined the prosecutor's office during the pendency of defendant's case. The trial court was informed of the matter, and it held a hearing to address the potential conflict of interest. Following the hearing, the trial court concluded that there was no need to disqualify the entire prosecutor's office because Hosticka would be properly screened out of any involvement in the matter. The trial court did not err.

"The trial court's findings of fact in regard to a motion for disqualification of counsel are reviewed for clear error." *People v Tesen*, 276 Mich App 134, 141; 739 NW2d 689 (2007). "However, this Court reviews de novo the trial court's application of the relevant law to the facts." *Id.* "Further, the application of ethical norms to a decision whether to disqualify counsel is also reviewed de novo." *Id.*

> A presumption of prejudice exists when a defendant's former defense counsel joins the prosecutor's office that is pursuing the case against the defendant. MRPC 1.9(b), 1.10(b). Such a presumption may be overcome, however, if the prosecutor shows that the attorney who has a conflict of interest was properly screened out from any participation in the matter. [*People v Davenport*, 483 Mich 906, 906 (2009) (*Davenport II*).]

If a defense attorney moves to the prosecutor's office, the trial court should be "promptly informed," and the trial court should then "inquire into the matter and order an appropriate safeguard, such as disqualifying the individual attorney affected by the conflict of interest, or the entire prosecutor's office, if necessary." *People v Davenport*, 280 Mich App 464, 470; 760 NW2d 743 (2008) (*Davenport I*). Relevant considerations include "the extent to which

-17-

knowledge has been shared by the disqualified lawyer and the disqualified lawyer's role within the prosecutor's office." *In re Osborne*, 459 Mich 360, 369-370; 589 NW2d 763 (1999).

Hosticka accepted a position at the prosecutor's office while defendant's case was ongoing. Although there may be a presumption that Hosticka's move to the prosecutor's office was prejudicial, see *Davenport II*, 483 Mich at 906, the prosecutor overcame this presumption with information about Hosticka's role in the office and assurances that defendant's case would not be shared, see *In re Osborne*, 459 Mich at 369-370. At the time of the hearing, Hosticka had not yet begun in the prosecutor's office, and when he did start, his job was in the family division. The prosecutor's office also assured the court that there would be no communication about the case between Hosticka and the prosecution staff handling the case. As a factual matter, the trial court credited the prosecutor's assurances about these screening measures. Given the efforts to screen out Hosticka from participation in defendant's case, disqualification of the prosecutor's office was not warranted, so defendant is not entitled to relief on appeal.

## IX. MEDIA AT TRIAL

Next, defendant argues that the trial court erred by failing to exclude the media from trial. According to defendant, media coverage created a risk that the jury would be exposed to "unfounded evidence" via news coverage and that the jury would discuss the case before the close of proofs. Defendant's arguments are without merit.

The public, including the press, has a First Amendment right to access to trial proceedings. *People v Vaughn*, 491 Mich 642, 660 & n 65; 821 NW2d 288 (2012). Defendant did not have the right to unilaterally demand a private trial, see *id.* at 659-660; and he has failed to make a showing that exclusion of the media was essential "to preserve higher values," *In re Closure of Jury Voir Dire*, 204 Mich App 592, 595; 516 NW2d 514 (1994) (quotation marks and citation omitted).[13] Rather than take the drastic step of excluding the media, the trial court instructed the jury to refrain from watching or reading anything about the case during trial. Jurors are presumed to follow their instructions, *People v Abraham*, 256 Mich App 265, 279; 662

---

[13] Defendant points to happenings at trial as evidence that the media's presence prejudiced him. First, defendant notes that, during trial, the trial court ordered the removal of cameras from the courtroom. However, this had nothing to do with defendant, and it is not an indication that his interests were prejudiced by the presence of media. Instead, after receiving reports that jurors had been filmed or photographed, the trial court exercised its discretion to restrict the presence of cameras in the courtroom to protect the jury and MJN. See Administrative Order No. 1989-1, as amended 493 Mich cxviii (2013). That the trial court exercised this discretion for the protection of the jurors and MJN does not demonstrate that defendant was entitled to exclusion of the media. Second, defendant contends that the trial court had to "reprimand the jury," and defendant asserts that one of the jurors used "social media platforms while acting as a juror." Defendant does not provide a citation to the record to support these factual assertions, nor does he explain how these concerns relate to the presence of the media at trial. By failing to adequately brief this issue, defendant has abandoned it. See *McGraw*, 484 Mich at 131 n 36.

NW2d 836 (2003), and this instruction was a reasonable alternative to preventing media access to the trial, cf. *People v Thomas*, 126 Mich App 611, 622; 337 NW2d 598 (1983). Defendant is not entitled to relief on this basis.

In the context of his media argument, defendant also makes reference to "bias," and he appears to assert that the trial court's decision to allow the media demonstrated bias against him. This cursory argument is without merit because, as discussed, defendant had no right to a private trial, and the trial court could not simply have excluded the media for no reason. See *In re Closure of Jury Voir Dire*, 204 Mich App at 595. Failing to take such unwarranted action is not evidence of bias.

## X. STATEMENT AGAINST PENAL INTEREST

Finally, defendant argues that the trial court erred by excluding portions of a transcript of a police interview with defendant's cousin, Bluhm. Defendant argues that exclusion of the transcript violated due process and denied him his constitutional right to confront his accusers.

In the trial court, defendant attempted to call Bluhm as a witness, but Bluhm invoked his Fifth Amendment privilege against self-incrimination and did not testify. Given Bluhm's unavailability, defendant sought to introduce portions of Bluhm's interview with police under MRE 804(b)(3) as statements against Bluhm's penal interest. The trial court admitted portions of the interview transcript, but concluded that Bluhm's statements about his possible alibi were inadmissible because they were *not* against Bluhm's penal interests. This is the ruling that defendant challenges on appeal.

We review defendant's preserved evidentiary challenge for an abuse of discretion. *Benton*, 294 Mich App at 195. "An abuse of discretion occurs when the trial court reaches a result that is outside the range of principled outcomes." *Id*. Constitutional questions are reviewed de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018).

Under MRE 804(b)(3), if a declarant is unavailable as a witness at trial, the following is not excluded by the hearsay rule:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

"The exception is based on the assumption that people do not generally make statements about themselves that are damaging unless they are true." *People v Washington*, 468 Mich 667, 671; 664 NW2d 203 (2003). Accordingly, "[t]he statement is trustworthy *precisely,* and *only,* to the extent that it is, in fact, against the interest of the declarant," and an entire conversation need not

be admitted simply because the declarant made *some* statements against his or her interests. *People v Watkins*, 438 Mich 627, 636-638; 475 NW2d 727 (1991).

> Each factual assertion sought to be admitted under that exception must be viewed as narrowly and specifically as reasonably possible, and the court must separately ask whether *each specific assertion* is so intrinsically against the declarant's interest that a reasonable person would not have said it unless it were true. In other words, to the extent such statements can be logically and reasonably severed and dealt with independently, they should be. [*Id*. at 646.]

It follows that, in this case, the trial court did not abuse its discretion by admitting only those portions of the transcript in which Bluhm made statements that tended to implicate him in criminal wrongdoing. In contrast, Bluhm's denials of involvement and his assertions of an alibi—an attempt to exculpate himself—were not against his penal interests, and these statements were, therefore, not admissible under MRE 804(b)(3). See *Watkins*, 438 Mich 636-638. Defendant has not shown an evidentiary error.

To the extent defendant claims a due-process violation arising from the trial court's evidentiary ruling, his claim is also without merit. "Although the right to present a defense is a fundamental element of due process, it is not an absolute right. The accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984). In other words, "the right to present a defense extends only to relevant and admissible evidence." *Solloway*, 316 Mich App at 198. Defendant has not shown a due-process violation arising from the trial court's evidentiary decision to exclude portions of Bluhm's transcript that did not meet the criteria for admission under MRE 804(b)(3).

Finally, defendant mentions his right to confront his accusers, and he appears to make a Confrontation Clause argument premised on the assertion that he had the right to confront Bluhm because Bluhm implicated defendant in criminal activity during the police interview. However, the prosecution did not call, or attempt to call, Bluhm at trial, and the prosecution did not attempt to introduce Bluhm's statements against defendant. Instead, *defendant* sought to call Bluhm as a witness, and defendant introduced Bluhm's statements. Although defendant was unable to call Bluhm, this does not establish a Confrontation Clause violation because defendant did not have an absolute right to call Bluhm as a witness in contravention of Bluhm's privilege against self-incrimination. See *People v Dyer*, 425 Mich 578-580, 580; 390 NW2d 645 (1986); see also *United States v Luck*, 852 F3d 615, 629 (CA 6, 2017). Ultimately, given that Bluhm did not testify, defendant had no right to confront him at trial. See *People v Gearns*, 457 Mich 170, 187; 577 NW2d 422 (1998), overruled in part on other grounds by *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999). Defendant's constitutional right of confrontation is simply not implicated by the trial court's exclusion of portions of the Bluhm transcript.

Affirmed.

/s/ Patrick M. Meter
/s/ Colleen A. O'Brien
/s/ Jonathan Tukel